ORIGINAL

# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF GEORGIA
# ATLANTA DIVISION

FILED IN CLERK'S OFFICE
U.S.D.C. - Atlanta

JUN 1 2 2014

JAMES N. HATTEN, Clerk
By: _____ Deputy Clerk

| | |
|---|---|
| ROLOSNIP, LLC, a Georgia Limited Liability Company, | ) ) ) |
| Plaintiff, | ) ) |
| v. | ) ) |
| | ) |
| ROOSTER PRODUCTS INT'L INC., a Texas Corporation, d/b/a THE ROOSTER GROUP and d/b/a ROOSTER MANUFACTURING SERVICES GROUP, | ) ) ) ) ) |
| Defendants. | ) ) |

CAP

Civil Action No. _____

**1: 14-CV-1840**

DEMAND FOR JURY TRIAL

## COMPLAINT

COME NOW Plaintiff, ROLOSNIP, LLC (hereinafter referred to as

"Rolosnip" or "Plaintiff"), by and through its attorney, Joel D. Myers, Esq.,

Myers & Associates, Intellectual Property Law, PC and hereby states its Claims,

Causes of Action and Counts against Defendant, ROOSTER PRODUCTS

INTERNATIONAL, INC. D/B/A ROOSTER GROUP  AND D/B/A ROOSTER

MANUFACTURING SERVICES GROUP (hereinafter referred to as "Rooster"

or "Defendant") (collectively, Plaintiff and Defendant may be referred to as the

"Parties") as follows:

## INTRODUCTION

1.      This is an action for (I) Actual Fraud; (II) Constructive Fraud; (III)

Misrepresentation; (IV) Georgia Racketeer Influenced and Corrupt Organizations

Act (RICO) Civil Violations; (V) Federal Racketeer Influenced and Corrupt

Organizations Act (RICO) Civil Violations (VI) Deceptive Trade Practices pursuant

to the Georgia Uniform Deceptive Trade Practices Act, OCGA § 10-1-370 et seq.;

(VII) Breach of Written License Agreement I; (VIII) Breach of Written License

Agreement II ; (IX) Willful, Wanton and/or Malicious Breach of Written License

Agreement I; (X) Willful, Wanton and/or Malicious Breach of Written License

Agreement II; (XI) Quantum Meruit; (XII) Tortuous Interference with Business

Relations; (XIII) False Advertising pursuant to the Lanham Act § 43(a), 15 U.S.C. §

1125(a); (XIV) False Advertising under the Georgia False Advertising Law, OCGA

§ 10-1-420 et seq.; (XV) Indemnification of Plaintiff by Defendant pursuant to

Agreements I and II; (XVI) Theft by Conversion, OCGA § 16-8-4; (XVII) Theft by

2

Extortion, OCGA § 16-8-16; (XVIII) Theft by Taking, OCGA § 16-8-16; (XIX)

Permanent Injunctive Relief against Defendant; (XX) An Accounting as a remedy

for the foregoing violations of law; (XXI) Punitive Damages of at least three times

the total amount of all other damages or at least 10% of the highest yearly revenues

for the last 3 years, whichever is higher and sufficient to punish Defendant for its

egregious acts thus sending a clear message that Defendant's willful and malicious

business practices should be ceased thereby protecting Plaintiff and any future

parties doing business with Plaintiff; (XXII) Negligence by Person Given Trust or

Confidence, OCGA § 51-1-19; and (XXIII) Plaintiff's Attorneys' Fees and costs for

the initial negotiations of and execution of Agreement I including attorneys fees and

costs related thereto; for the negotiations of and execution of Agreement II including

attorneys fees and costs related thereto; all attorney's fees and costs associated with

the present litigation; and all attorney's fees and costs associated with the litigation

improperly filed by Defendant in Texas pursuant to: a) Paragraph 9.A. of Agreement

I; b) Paragraph 9.A. of Agreement II; c) O.C.G.A. §13-6-11 the Georgia stubbornly

litigious statute; d) Georgia Uniform Deceptive Trade Practices Act, OCGA § 10-1-

370 et seq.; e) Lanham Act § 43(a), 15 U.S.C. § 1125(a); f) Georgia False

Advertising Law, OCGA § 10-1-420 et seq.: g) Federal RICO Act; h) State RICO

Act; i) any other relevant statute that allows for attorney's fees and costs; and/or j)

3

the equity powers of this Court.

Plaintiff seeks permanent injunctive relief; damages, to the fullest extent permitted by law, sustained by Plaintiff as a result of Defendant's fraudulent acts and misrepresentations, state and federal false advertising, numerous breaches of two contracts, deceptive trade practices, tortuous interference, state and federal RICO violations; Defendant's profits realized from its State and Federal false advertising; treble damages and punitive damages resulting from Defendant's willful, wonton and malicious breaches of two contracts, fraud, misrepresentations, stubborn litigiousness, State and Federal RICO, deceptive trade practices, tortuous interference, acts of bad faith dealings and its foregoing and continued behavior; and all costs and fees, including reasonable attorneys' fees and all reasonable expenses of litigation.

## THE PARTIES/JURISDICTION

2.     Plaintiff, Rolosnip is a small Georgia Limited Liability Company having an office in Atlanta, Georgia at 400 Galleria Pkwy, Suite 240, Atlanta, GA 30339.  In

4

both written Agreements I and II[1] (the only written agreements ever entered between the parties), the Parties considered and negotiated a forum selection provision that, in the event of a conflict regarding either Agreement, the Parties agreed and consented to the jurisdiction of any court located in Georgia; *See* Exhibit A  Agreement I,  ¶ 16.M.  *See Also* Exhibit B, Agreement II,¶ 16.M.  Both Parties also agreed that the law applied shall be that of Georgia.  *Id.*      Pursuant to 28 U.S.C. § 1332, Diversity of Citizenship, both Parties are considered citizens of different states, and just considering expectation damages, the amount in controversy is at least $29,500,000, which does not include any punitive damages for the various intentional torts, lost opportunity damages, Defendant's Profits, any award of attorneys' fees and costs, or any other award this Court deems appropriate and thus, the amount in controversy well exceeds the $75,000 required amount.  *See* Complaint ¶¶ 69 et seq.  *See Also* 28 U.S.C. § 1332.

      3.     Defendant Rooster is a Texas Corporation having its principal place of

---

[1] Agreement II was an amendment to Agreement I, wherein the parties amended certain provisions (see Background Facts) and agreed that all provisions of Agreement I that were not amended, remained in full force and affect.  The Parties both agreed that provision 16.M. (forum to be any Court in Georgia and governing law to be that of Georgia) would remain as-is and would be in full force and effect for Agreement II and thus was not amended.  Agreements I and II are the only written agreements ever entered between the Parties, and in both of said agreements,  the Parties agreed to any court in Georgia and to subject themselves to said jurisdiction and to apply Georgia law, thus, the Parties intent was clear.

business at 17289 N. Green Mountain Road, San Antonio, Texas 78247. As stated above, in both written Agreements I and II, the Parties considered and negotiated a forum selection provision that, in the event of a conflict, they agreed and consented to the jurisdiction of any court located in Georgia; additionally, both Parties also agreed that the law applied shall be that of Georgia. *See* Exhibit A and B, Agreements I and II, ¶ 16.M.   Pursuant to 28 U.S.C. § 1332, Diversity of Citizenship, both Parties are citizens of different states, and just considering expectation damages, the amount in controversy is at least Twenty Nine Million Nine Thousand Four Hundred Seventy and no/100 U.S. Dollars ($29,009,470), which does not include any punitive damages for the various intentional torts, lost opportunity damages, Defendant's profits, any award of attorneys' fees and costs, or any other award this Court deems appropriate and thus, well exceeds the $75,000 required amount in controversy. *See* Complaint ¶¶ 69 et seq. *See Also* 28 U.S.C. § 1332. Defendant is registered with the Georgia Secretary of State as a foreign company doing business in Georgia.

## FACTUAL BACKGROUND

4.     The following is a brief summary of what has transpired now for an

unbelievable 3 ½ -year period, wherein Plaintiff, Rolosnip, was promised by

Defendant, Rooster, that if it would grant Defendant an exclusive license to

manufacture, sell and distribute Plaintiff's ROLOSNIP technology for preferably the

life of Plaintiff's potential U.S. utility patent (20 yrs measured from the filing date)[2]

[3], Defendant would fulfill every one of Plaintiff's requests.[4] As a new, up and

coming tool innovator, Plaintiff knew the value of what it had, hence the reason why

a two time Lowe's Home Improvement Warehouse Supplier of the Year in tools with

$100,000,000 to $250,000,000 per year in sales wanted to lock-in the exclusive

manufacturing, distribution and selling rights for the ROLOSNIP Technology.

Consequently, the parties reached an agreement and entered into an Exclusive

License Agreement (hereinafter referred to as "Agreement I"). *See* Exhibit A,

Agreement I. *See* Exhibit D, The Rooster Group Corp From Data.com.

---

[2] The Parties in Agreement I, agreed to a term of 10 years with automatic annual 1-yr renewals until Plaintiff's potential patent expires.

[3] Often times, royalties will continue for some time past the original 20-year patent period either because of a phase-out period or because there may be additional patent applications filed or continuation-in-part patents issuing that may require new or extended license agreements.

[4] Getting the ROLOSNIP manufactured and in the stores in time for the 2011 Holiday Season (at the time, there were 10-11 months before said holiday season); allowing Plaintiff to retain rights to television, Internet and foreign sales; maintaining a high level of quality; allowing Plaintiff to purchase from Defendant the ROLOSNIP tool when needed and at the quantity desired to fulfill Plaintiff's sales as to its retained rights at Defendant's Cost of Goods (COG) plus a 10% over-ride; and either a lump-sum upfront payment or, alternatively, quarterly guaranteed royalty payments to be paid by Defendant to Plaintiff every quarter irrespective of any sales or not.

5.     As part of the negotiated bargain of Agreement A, Plaintiff retained the rights to sell its ROLOSNIP via Television and the Internet, which combined was expected to approximately equal the volume of sales Defendant was expecting via big-box chains. *See* Exhibit A, Agreement I, for the conservative minimum that Defendant was willing to guarantee to Plaintiff as set out in said Agreement I. Additionally, Plaintiff retained the right to sell the ROLOSNIP technology outside the United States.  Pursuant to the Parties' Agreement I, Defendant was to have the ROLOSNIP manufactured, wherein Plaintiff could buy the quantity Plaintiff needed for its Television and Internet sales from Defendant at Defendant's costs plus a 10% override. *Id.* Because of Defendant's association with many big box chains and because of their enormous amount of annual of sales[5], Defendant enjoys a significant economy of scales and thus, is able to have the ROLOSNIP manufactured at a per unit cost for much less than a small company like Plaintiff. Moreover, a small

---

[5] Per Data.com,  Defendant's annual sales are $100,000,000 - $250,000,000/yr with numerous name brands and hundreds, if not thousands, of various hardware products that are sold in most of the big-box chains, more specifically, The Home Depot, Wal-Mart, Kmart, Sears, Menards, True Value, Lowe's and many others.  As more fully described below, Defendant used its reputation, leverage, inside confidential information about Plaintiff, empty promises and fraudulent statements to take advantage of Plaintiff's start-up position in order to lock down the exclusive rights to manufacture and sell the ROLOSNIP. *See* Exhibit D, Rooster Group Corp From Data.com.

company without a credit history is going to be required to place significant funds upfront to cover a manufacturer's tooling costs and other costs associated with a new product, and most likely, the small company will also incur the full costs of the first few minimum order requirement.

6. Nonetheless, for Plaintiff, it seemed like a dream come true; however, as Plaintiff not-so-soon learns[6] and as described in more detail herein below, Defendant failed to meet any deadlines, make any payments and in fact, had done nothing (as admitted by Defendant) toward getting the ROLOSNIP manufactured. In response to Plaintiff's first inquiry regarding Defendants failure to have the manufacturing complete and failure to pay the MRR, Defendant actually tried to say that they were unaware of the MRR being in Agreement I and thus wasn't going to pay same. The irony is that it was Defendant who offered up the MMR numbers and there are numerous emails during the lengthy (10 months) negotiation period. After Defendant was reminded of these facts, they dropped the ridiculous argument, and instead tries the bullying method by telling Plaintiff that if they wanted to have a chance of Defendant manufacturing and selling the ROLOSNIP, a new agreement or

_____

[6] 2 years had transpired since Defendant first reviewed the ROLOSNIP Technology and promised Plaintiff that they would have the ROLOSNIP in stores within 8 months.

9

amendment had to be created wherein Plaintiff had to release Defendant and waive

any claims against Defendant. Moreover, Defendant instructed Plaintiff that

Defendant would not commit to any specific date and thus would only agree to "try"

obligations; in other words no liability and no obligations. *See* Attachment G, Emails

by Defendant Showing Defendants Ridiculous Demands. Plaintiff responded by

sending Defendant a Notice of Breach Letter, which not only served to place

Defendant on notice, but was intended to send a clear message that, even though

Plaintiff is a small company that has been literally crippled by Defendant's blatant

abuse, Plaintiff was not going to stand by and let Defendant run them over and that

Plaintiff was not going to release Defendant or waive any claim until Defendant

fulfilled its obligations as agreed; Plaintiff also summarized for Defendant,

Defendant's liability it had created for itself due to its admitted intentional acts.

Afterwards, Defendant apologized and stated that they decided (unilaterally) to place

the ROLOSNIP project on hold so they could prioritize their efforts on the upcoming

line review they had with Lowe's[7] (but didn't bother to inform Plaintiff much less

ask Plaintiff for a written amendment for an extension and for both parties to sign

---

[7] The Lowe's account is worth several millions of dollars to Defendant thus, Defendant made a conscious and deliberate decision to breach Agreement I for the purpose of financially benefiting Defendant while destroying Plaintiff

said extension as required in Agreement I), *See* Exhibit C, Emails Regarding

Defendants Breach. In essence, despite knowing the devastating consequences that

Plaintiff would suffer as a result of Defendant's actions, Defendant willfully,

wantonly and maliciously chose to disregard its negotiated and agreed upon contract

obligations it had with Plaintiff for the sole financial benefit of Defendant; Plaintiff

was the easy sacrifice, so Defendant thought. Moreover, to further add to the level of

Defendant's already shockingly egregious acts, Defendant tries to take advantage of

the Plaintiff they just crippled and bully it into a new agreement and a complete

release. This would be like a semi-truck intentionally running a red light and

running over a person because they could make more money getting their cargo to its

destination quicker if they didn't have to abide by the law and stop at the red light.

And then, after unloading their cargo, they drive back through the same intersection

where they see the crippled person they ran over crying for help and bleeding

profusely from a head injury, so they pull their truck straight in front of the person

and tell him that if he doesn't sign a release and hold harmless agreement waiving

any claim he may have against the semi-truck company/driver, he is going to run him

over again!

   7.   As part of the Parties' Agreement I, Paragraph 16.L., Defendant clearly

11

agreed to use its "**Best Efforts**, but no less than industry standard, **to market, promote and generate sales** of Product [ROLOSNIP Technology] **throughout the entire area of North America**. Licensee further agrees to **use sufficient funding to market and promote the Product** [ROLOSNIP Technology]." *See* Exhibit A, Agreement I, ¶ 16.L (emphasis added).  Defendant chose to intentionally and willfully breach every aspect of the best-effort provision in total disregard to and disrespect of Defendant's legal obligations under Agreement I and the obvious and foreseeable consequences to Plaintiff's business, its officers and its owners. Defendant not only stripped Plaintiff from its bargained-for benefit but also destroyed Plaintiff's opportunity to mitigate and further costing Plaintiff substantial amounts of time and money.  Every element of Defendant's actions and inactions clearly show, at a minimum, Defendant's complete and utter disrespect for the sanctity of a legal contract, and at the highest, Defendant's willful and malicious intent and willingness to commit fraud in order to lock a party into an exclusive agreement, believing that by the time Plaintiff uncovers Defendant's fraud, Plaintiff would be unable to afford a legal battle against a $100,000,000+/yr company and that they would be unable to have the ROLOSNIP manufactured themselves thereby forcing Defendant to renegotiate and give Defendant an opportunity to try to pull

12

back, correct or limit its liability related to its fraudulent promises, numerous

breaches (some of which Defendant admits were intentional and willful via email)

and try to bully Plaintiff into releasing and waiving Defendant's intentional acts.


8.     After Defendant failed to meet the "First Shipment" deadline as required

in Agreement I and failed to provide Plaintiff any proof of progress, Plaintiff began

to further investigate and uncovered that Defendant had failed to take any action in

progress of Agreement I.  To add further insult (and injury) to injury, when the first

MMR payment became due, Defendant failed to make said payment and advised

Plaintiff that they do not intend on ever making a MMR payment despite the fact that

Defendant and Plaintiff negotiated same, Defendant provided the MMR numbers,

incorporated same into Agreement I and agreed to same via email and by their

signatures on Agreement I and their initials of every page.  *See* Exhibit A,

Agreement I.


9.     Consequently, prior to Plaintiff being misled by Defendant and wasting

more than 3 ½ years, spending thousands of dollars and losing millions of dollars in

the bargain for benefit, Plaintiff could afford to approach a manufacturer and have

the ROLOSNIP manufactured itself; Plaintiff's upfront costs and cost per unit would

have certainly been higher, but at that time, manageable. However, due to

Defendant's willful, wanton and malicious acts and failure to perform, Plaintiff has

not only lost the benefits for which it bargained for in Agreement I and Agreement II,

it has suffered catastrophically and can't even mitigate further damages by having the

ROLOSNIP manufactured itself. Defendant was intimately aware of Plaintiff's

financial conditions even before they examined Plaintiff's first working prototype

back in January 2011 as one of the officers for the Plaintiff, Robert Adams, started

contract consulting work with Defendant in late 2010 or early 2011 and continued to

do same until December 2013. He had originally approached Defendant to see if they

wanted to invest in Rolosnip, LLC. Thus, several confidential conversations about

Rolosnip, LLC, including its financial position, its business plan and the ROLOSNIP

designs were discussed at several times with the President Juan Pablo and others of

Defendant. It was from these conversations and their review of the working

prototype that Defendant wanted a 10-year exclusive license to manufacturer the

ROLOSNIP and a 10-year exclusive license to distribute and sell the ROLOSNIP.

Plaintiff explained to Defendant that time was of the essence and that Plaintiff was

talking with other manufactures but at the time preferred Defendant; however, due to

Defendant's size and the large number of products sold by Defendant, Plaintiff was

concerned that the ROLOSNIP would not be high on Defendant's priority list and as

14

such, could be placed on the back burner. Additionally, Plaintiff explained that if

they locked in with Defendant, Plaintiff would lose their other manufacturing leads.

Moreover, early on in the Parties' discussion of the ROLOSNIP, Plaintiff expressed

that Defendant, due to its connections with many big box chains and proven history

of sales, was one of Plaintiff's top choices to partner with; however, as time is

money, if Plaintiff had to get the ROLOSNIP manufactured and to market itself, time

was of the essence and if Defendant wasn't interested, to please let Plaintiff know as

soon as possible.  Plaintiff was also talking with other manufacturers and investors it

could partner with if Defendant was not interested.

        10.    Additionally, Plaintiff explained to Defendant that its goal was to get

ROLOSNIP launched with product in stores by the 2011 Holiday Season which, at

the time, was about 1-year away, and as Plaintiff had sufficient but limited resources,

if Plaintiff was to proceed on its own, it didn't have the luxury of time and thus, if

Defendant was not interested, to please let Plaintiff know as soon as possible.  More

specifically, any delays would result in Plaintiff's expenses eating away at Plaintiff's

available funds and Plaintiff losing the investor that was interested.  Defendant soon

thereafter expressed that they were interested and could get the ROLOSNIP

                                          15

manufactured and in the stores before the 2011 Holiday season[8] and that Plaintiff

could cease talks with other manufacturers as Defendant wanted exclusivity. As a

purported good-faith showing of Defendant's commitment, Defendant agreed to put

in the license agreement an 8-month time requirement on itself to get the ROLOSNIP

on the shelves (however, as with several promises, Defendant unilaterally changed its

promise). *See* Exhibit A, Agreement I. As Defendant's promises and eagerness

painted an almost perfect situation for Plaintiff, Plaintiff was excited to memorialize

the Parties' agreement and get started. However, much to Plaintiff's dismay, the very

things that Plaintiff feared, and then some,  Defendant has made a painful and

unfortunate reality  (i.e., not only missing the 2011 Holiday Season, but also missing

the 2012 Holiday Season, the 2013 Holiday Season, and now, apparently the 2014

Holiday Season; delays that result in costs and expenses eating away at Plaintiff's

available funds to a point where they no longer have the funds to get the ROLOSNIP

manufactured themselves; relying on the promises and obligations of Defendant and

---

[8] At that time, it was  January 2011.  Releasing a product during the Holiday season (~November 26
thru January 2) can result in an enormous jump start for a product.  In order to make it in time for
the Holiday Season, Defendant explained that the product needed to be on the shelves by
approximately mid November.  The Parties had approximately 10 months; consequently, Defendant
assured Plaintiff that Defendant would have no problem getting the ROLOSNIP on the shelves
within 8 months.  It has now been approximately 41 months and Defendant has still not fulfilled its
contractual obligations.

16

the Parties' negotiated terms, only to be handcuffed for 3 ½ years, losing potential investors and manufacturers, and then being told by Defendant that they do not intend on fulfilling their contract obligations on either contract; having to fight a Goliath in court on a very limited budget with no product or funds in sight; at 41 months[9] after Plaintiff, without question, has timely fulfilled ALL of its contractual obligations and thus reasonably expecting to be enjoying the benefit of the bargain (at least Twenty Nine Million Nine Thousand Four Hundred Seventy and no/100 U.S. Dollars ($29,009,470)) but instead, having to sink more money into fighting two expensive lawsuits with neither product nor funds in sight because bully Defendant decides that integrity, honor and respect for the law are not important (despite Rooster's ironically false representation of same on their websites at www.roostergroup.com[10] and www.roostermanufacturing.com wherein Rooster

---

[9] Defendant contractually obligated itself to make the first shipment of the ROLOSNIP within 8 months of the execution date of Agreement I. The problem, however, was that Defendant delayed the negotiations and final execution of Agreement I, such that it wasn't executed until November 10, 2011, taking 10 months to finalize. In other words, the 10 months that were available and were promised by Defendant as being enough time to memorialize the Parties agreement, have the tool perfected and manufactured, and have the first shipment sent, was taken up by the license agreement.

[10] Prior to entering into Agreement I with Defendant, Plaintiff, in performing its due diligence regarding Defendant, researched the Defendant's website www.roostergroup.com and read all the material thereon, including the false advertisements, and relied thereon as part of its basis in deciding to partner with Defendant. *See* Exhibit E, Website Pages Representing False

17

states that they are the "**leaders in ... integrity**"; that they have the "**simple philosophy of doing what is right**"; "**Speed to Market: Our global presence allows us to optimize logistics and lead-times ...**"; and two of the most ironic and misleading statements are "**If you are looking for a partner with the experience to get your products to market on time and in excellent condition, please contact us**";  and Rooster representing itself as having "**unsurpassed speed to market**" is almost laughable). *See* Exhibit E, Website Pages Representing False Advertisements. Consequently, Defendant was fully aware of Plaintiff's reliance and dependency on Defendant and instead of acting in good faith and fulfilling its promises and obligations, Defendant chose to take advantage of it by giving Plaintiff knowingly false hope to convince Plaintiff to lock-in exclusivity with Defendant and to cease trying to find other licensors or investors, thus making Plaintiff even more dependent and ultimately crippling Plaintiff.  As will become more clear from reading all the facts herein (similar to how it has become clear to Plaintiff as this has played out) it is believed that Defendant promised Plaintiff 8 months to get the ROLOSNIP on the shelves and incorporated same in Agreement I to fraudulently induce Plaintiff into

---

Advertisements.

signing over their exclusive rights to Defendant and had no intent on fulfilling their contractual obligations and in fact, intentionally delayed by failing to take any action on the ROLOSNIP and by being as difficult as possible in order to further cripple Plaintiff and make them highly dependent on Defendant thus forcing Plaintiff to have to renegotiate Agreement I or otherwise lose everything. *See* Exhibit B, Agreement II.

11. What transpired after Plaintiff agreed to grant Defendant said exclusivity was nothing short of shocking with Defendant maliciously delaying every aspect of the Parties' relationship. Once the Parties agreed to the general terms of their agreement, all that was needed was for their agreement to be memorialized into a fairly standard written license agreement --- normally a process that takes a couple of weeks maybe a month at the most. However, Defendants managed to drag out the contract negotiations for a ridiculous 10-month period! Defendant used every possible delay tactic from there in-house counsel taking weeks at a time to review simple changes, to blaming the President's travel, to asserting that numerous people at Rooster had to review it, to reversing what the Parties negotiated and agreed to thereby causing rework, additional review, consternation, frustration and ultimately, more delay. For example, in negotiating the quarterly Minimum Royalty

19

Requirement (MRR) provision, Plaintiff asked Defendant, conservative speaking,

what is the lowest number of unit sales Defendant is expecting per quarter at big box

chains? Defendant, as previously stated while selling Plaintiff on a contract,

answered easily 200,000 units/quarter or 800,000 units/year just based on the one

version of the ROLOSNIP[11]. As such, Plaintiff incorporated these numbers for the

MMR as previously provided by Defendant in a draft to Defendant. However, even

though Defendant provided these numbers based on their stated informal survey of

various big box buyers coupled with many years of experience selling thousands of

various products in the hardware class, the Defendant insisted on changing the MMR

to 62,500 units/quarter and wanted a graduated MMR to give time for the

ROLOSNIP to get on the shelves and for customers to discover them. Based on

information and belief, it appears to Plaintiff that Defendant already knew it wasn't

going to make the 8-month deadline. Plaintiff further believes that Defendant

changed the MMR from its original number of 200,000/quarter in large part because

they knew that Plaintiff was frustrated with the numerous number of months the

license agreement had already taken and thus, knew they could strong-arm Plaintiff

---

[11] Initially, Plaintiff has planned 3 versions: a Pro or Heavy Duty Version, a Standard Version and an Economical Home-Maker Version. Agreement A, including the MMR, was written with the contemplation of the Standard Version to start with.

20

into a much less of a guaranteed number.  Another example of the Parties  was the

8-month time frame promised by Defendant before any license agreement was

initially drafted.  At the time it was promised, Defendant knew that the license

agreement still had to be drafted and finalized.  When drafting of Agreement I started

(January '11), there were 10 months until product had to be on the shelves in order to

make the '11 Holiday season.  Hence, it is believed that Defendant was already

taking into account 2-3 months to finalize the agreement, thereby leaving 8 months

to reach the store shelves.  Or, alternatively, and more likely Defendant was simply

telling Plaintiff what it wanted to hear in order to induce them into granting

exclusivity.  In the actual written agreement just prior to finalizing same, Defendant

insisted on keeping the deadline at 8 months even though 10 months had already

passed and moreover, insisted on changing what the actual deadline was defined as.

More specifically, the Parties previously discussed 8 months to get the product on the

shelves but when the agreement was put in writing, Defendant insisted that it be

change to "8 months from contract effective date - First Shipment." *See* Exhibit A,

Agreement I. Any objection by Plaintiff (especially after about 10-months of going

back and forth with Defendants thus costing Plaintiff an enormous amount of time

and money and thereby putting Plaintiff between a rock and a hard place) was

responded with bully threats of Defendant walking away from the deal wherein

21

Defendant knew after so many critical months had past that Plaintiff had no other

reasonable option and couldn't allow Defendant to walk away.  Agreement I was

finally completed and signed on November 10, 2011, approximately 10 months after

the Parties initially discussed same and agreed to the general terms! *Id.*


12.    Once Agreement I was finally completed and executed, Plaintiff focused

on its retained rights to sell via the television, the Internet and outside the US by

developing a plan, researching various channels of trade and services, and building

relationships so that when the manufacturing of the ROLOSNIP was perfected and

was being mass produced (per Agreement I, the first shipment was to be within 8

months of execution, by July 10, 2012), Plaintiff would be ready to hit the ground

running.  *Id.*  However, July 10, 2012 came and passed without any news from

Defendant; after Plaintiff made several inquiries, Plaintiff learned the devastating

truth that Defendant had done absolutely nothing with the ROLOSNIP; Defendant

had not even presented it to the manufacturing facility much less had any produced.

As such, Plaintiff was handcuffed and all the preliminary work it had done in

preparation of selling the ROLOSNIP was in vain; moreover, as Plaintiff had

promised various parties within its channels of trade that the ROLOSNIP would be

released no later than July 10, 2012, Plaintiff has lost an enormous amount of

credibility (especially now its 2 years even after that date and there's still no

ROLOSNIP) that will never be recoverable.   Not only has Plaintiff lost credibility

with its channels of trade, Plaintiff has lost all the royalty payments from the sales

Defendant would have made and all the profit from sales Plaintiff would have made,

in addition to enormous lost opportunities.   Plaintiff tried to look at a positive side

and assume that Defendants were simply busy but had every intention on fulfilling its

obligations and would do so promptly; in the meantime, Plaintiff knew it had a

MMR[12] payment coming January 30, 2013 for $18,000, which would go a long way

in permitting Plaintiff to pay its bills, its officers and to survive.   To facilitate

Defendant's payment, Plaintiff submitted to Defendant an invoice in January 2013.

However, as if things could not get any worse for Plaintiff, Defendant shockingly and

without any remorse had the tenacity to argue that they were unaware of a MRR and

---

[12] A MMR required payment became due within 30 days of the last day of every quarter whether or
not Defendant sold any ROLOSNIPS that quarter.  *Id.*  In recognition of the fact that sales would
need to ramp up, the Parties agreed that the full MRR (62,500 units per quarter) would not begin
until the 2nd Qtr of 2013. In addition, to account for a ramp-up period, the 4 Qtr 2012 MRR was set
at 30% of MRR (18,750 units for 4th Qtr 2012) and the 1st Qtr of 2013 was set at 50% of MRR
(31,250 units for 1st Qtr of 2013), wherein Defendant was to pay Plaintiff within thirty (30) calendar
days after the end of the respective quarter. Additionally, in order for Plaintiff to recoup some of its
initial investment, Defendant agreed to pay Plaintiff $1.00 for the first 25,000 units, in lieu of the
chart based on COG .  However, despite Defendants contractual obligation and Plaintiff's demand
for the MRR payments, Plaintiff has not received any payments and Defendant has expressly
refused to comply with the MMR provisions of Agreement I which was negotiated for 10-11 months
and signed by the very person that has now refused to pay, Juan Pablo, President of Defendant.

23

thus was only going to pay royalties on sold units! *See* Exhibit F, Email Showing

Defendant's Refusal to Pay MMR Despite It Being A Central Term of Agreement I.

The ridiculousness of Defendant's position is magnified by the fact that it was

actually the Defendant who provided the MMR number themselves and the fact that

Plaintiff and Defendant has numerous emails wherein the MMR was discussed in

negotiating Agreement I. *See* Exhibit H, Emails Wherein MMR Was Discussed

During Negotiations. In response, Defendant's position was basically who cares, we

are Goliath and you are David and we can unilaterally change the contract as we see

fit!

      13.    Defendant tells Plaintiff that Defendant has decided it doesn't like the

contract the Parties negotiated and executed and thus has decided not to pay any

MMR but that they will still manufacture the ROLOSNIP but without any promises

of when the first manufacturing run will be completed, when the first shipment will

be made or when the ROLOSNIP will make it to the shelves. Plaintiff explained to

Defendant that they are under a contract and have obligations to perform and how

they have substantially injured Plaintiff. Despite knowing how handcuffed and

crippled Plaintiff had become due to Defendant's actions, Defendant chose to use

this to their advantage demanding that the parties can enter into a new contract,

24

wherein Plaintiff must release Defendant from all breaches and all liability and

amounts due, Defendant will agree to manufacture the ROLOSNIP but with no

promises of dates, and any MMR had to be removed. *See* Exhibit G, Emails Showing

Defendant's Ridiculous Demands. Plaintiff should have asked Defendant how they

would feel if a manufacturing plant they contracted with to produce their #1 selling

tool promised them the tool months ago, tied them up for years with periodic

misleading discussions about continuing to manufacture the tool, and then suddenly

months after the tool should have already been on the market and they should have

been receiving payments for POs, the manufacturing plant that they put their trust in,

tells them oops we unilaterally decided not to do what we contractually agreed to do

8 months ago, and not only are we not going to fulfill our design or manufacturing

obligations or contractual payment obligations, we are also not going to pay you for

our breaches, our misrepresentations and having tied you up for 3 1/2 years and in

addition, to add insult to injury, further disrespect you by telling you the contract

terms that they substantially prepared and were negotiated by both parties with

substantial evidence and correspondence clearly defining the parties intent, is not the

parties intent because now in contradiction to all the evidence, they have unilaterally

decided that they didn't like those terms as originally negotiated and agreed to, and

are changing them to a new meaning that just happens to result in zero liability for

25

them.

14.     It appears that Defendant's position at the time was something along this line: We can tie you up with an exclusive for 3 years so that you can not license to any other manufactures or retailers and lead you to believe we are going to develop it, produce it and get it into retail and promise a date by which we will; however, we decide if and when we really want to do this and we don't have to pay anything or have any real obligations to you unless we actually do what we say we would do and sell product. Our failure to proceed with development, manufacturing, selling and to meet the milestone date (that contained the unambiguous statement that time was of the essence and that the milestone date is "important for keeping on track with the parties' intent and as such are material to this Agreement ) per the Agreement that we negotiated for several months and signed, was just a suggestion and really created no obligation on our part. The fact that we agreed (and you relied on) that the dates were MATERIAL and that time was of the essence and that the MRR started a date SPECIFIC, has no meaning and doesn't apply to us because we reserved, in our head, the right to modify (despite the clear provision that states otherwise) the agreement as we see fit.  Notwithstanding the fact that we didn't meet the milestone dates; we didn't produce the tool; we required Exclusivity but dismiss it as no value; and didn't

26

pay you as promised, you can trust us now and if you will grant an extension, drop the claims you have against us and give us Exclusivity (but even though we dismissed exclusivity and discredited its value we will require exclusivity again), we will TRY to produce the tool (but won't commit to any date specific or that we will actually produce it), we will take it to our main customers (but won't commit to any date specific), we will pay you (but only if it sales), and we will CONSIDER paying for Kris' trip to China (but only if we believe it will speed up the process - please note, our belief may change at a drop of a dime). Also, please do not consider our past history of retro-redefining terms of a contract we signed, failing to pay you and failing to accept any responsibility as indicative of what might happen to you in the future. In other words, if you release us from all claims you have against us (millions of dollars) for our breaches, all obligations we have under the 10-year contract we signed, we will agree to TRY to do sometime what we already had promised to do by a specific date ... but this time, you can trust us! (please note that even though our obligations under my new proposed terms are illusory and we will have ZERO liability in the likely event we breach, if you agree to release us from your multimillion dollar claim, we will do what we didn't do under the previous contract.

15.    Despite the fact that Plaintiff was in a seriously bad spot with no where

27

to turn except to possibly go to court, Plaintiff decided to try one last time to

amicably resolve the situation by having their attorney draft a breach of contract

letter with a clear explanation of how Defendant was liable for several millions of

dollars; however, Plaintiff had decided that, to the best of its ability, it was no longer

going to let the Bully Defendant run them over and that under no circumstance

would Plaintiff release Defendant and waive any claims it has against it, unless

Defendant completed the manufacturing of the ROLOSNIP in a timely manner

wherein specific milestones had to be met. After said letter, Defendant admitted that

they had done nothing regarding the manufacturing or any other obligation because

they were busy with their other products and their line review for Lowe's and asked

that Plaintiff not file suit but instead grant Defendant an extension to complete the

first run manufacturing. Plaintiff was very reluctant to enter into another contract

with Defendant or to amend Agreement I as Plaintiff, understandably, was unsure of

Defendant's sincerity. Defendant's lack of sincerity soon became apparent again.

What was to be a simple amendment to Agreement I turned into another lengthy

delay tactic and attempt to avoid the large liability Defendant maliciously created for

itself. Until Plaintiff set its foot down and said enough is enough and again

suggested that the Parties would have to settle their dispute in court, would

Defendant finalize the amendment, Agreement II, which kept all the previous non-

contradictory provisions.[13] *See* Exhibit B, Agreement II.  Plaintiff granted Defendant

a more than reasonable several month extension, hoping that Defendant would step

up and do the right thing, what it promised to do (Defendant did not agree to

Plaintiff's first suggested extension but instead wanted a larger extension).  Again,

with their backs against the wall, Plaintiff wanted to get the ROLOSNIP

manufactured without further issues, Plaintiff agreed to Defendant's requested length

of extension if, and only if, the other provisions regarding no release unless the

milestones were timely met; however, Plaintiff was immensely disappointed and

frustrated when said extended deadlines were casually missed AGAIN by Defendant

without Plaintiff receiving any communication indicating any problems by Defendant

until Plaintiff wrote to Defendant expressing its complete frustration.  In response,

Defendant writes a clearly fabricated self-serving letter filled with blatant lies and

inaccuracies.  Then in complete disregard to the forum selection provision of

Agreement I and Agreement II and the U.S. Supreme Court in *Atlantic Marine*

*Construction Co., Inc. v. United States District Court of Texas et al.* 571 U.S.  (2013),

Defendant files suit in Texas to further its stubborn litigiousness nature in an attempt

---

[13] Including a forum selection provision that the Parties negotiated and agreed that in the event of a dispute, the Parties would use a court located  in the State of Georgia and further agreed to consent to the jurisdiction of said court and that the contract would be construed pursuant to Georgia law.

to drive the cost up for Plaintiff and force Plaintiff to give in. Ironically, said U.S.
Supreme Court ruling was directed to a court located in Texas, who failed to honor
the forum selection provision of a contract the parties had negotiated and agreed to.
Moreover, Rooster and their attorney failed to even mentioned to the Texas Court
that the Contracts had a forum selection clause. Any attorney located in Texas
should be fully aware of the U.S. Supreme Court ruling and should result in said
attorney and his client having to cover all legal costs and fees dealing with the Texas
filing.

16. As for minimum payments due from Defendant for the MRR: using the
$0.50 royalty rate, Defendant owes Plaintiff as of January 30, 2013, $18,000; as of
April 30, 2013, $18,750; as of July 30, 3013, $31,250; October 30, 2013, $31,250;
January 30, 2014, $31,250; and April 30, 2014, $31,250; thus, as of the filing date of
this lawsuit, Defendant owes Plaintiff just for the MRR a total of $161,750 plus
interest.

17. As Defendant has the exclusive right to manufacture, even though
Plaintiff retained the rights to sell through television and the Internet, Plaintiff's
ability to sell through its retained channels of trade is completely at the mercy of

Defendant abiding by the terms of the Parties' negotiated and signed contract,

Agreement I. It has now been more than 2 ½ years[14] since Defendant, as agreed in

Agreement 1, was supposed to have manufactured the ROLOSNIP; however, all

Plaintiff has to show for its thousands of invested hours and dollars, is two lawsuits

and more costs. Defendant's intentional and malicious actions and inactions have

almost destroyed Plaintiff who is now on the verge of insolvency; if Defendant had

simply fulfilled its obligations to the contracts it agreed to and signed, Plaintiff, just

taking into consideration the guaranteed MMR portions and a very conservative

measure of Plaintiff's sales, should have already made over $4,125,000[15].


18. Defendant had to go to great lengths to effectuate the enormous

magnitude of its counter-productivity regarding Plaintiff. Throughout the entire time

Plaintiff has been working with Defendant, the last 3 ½ years, Defendant has failed

to meet any deadlines, has failed to fulfill any of its contractual obligations, has acted

---

[14] Its been approximately 3 ½ years when you include the time it took for Defendant to evaluate Plaintiff's original sample and negotiate the license agreement.

[15] When you extend the conservative MMR measure over the full length of the contract term of 10 years, Defendant's malicious actions have costs Plaintiff over $13,750,000. If you logically extend these conservative numbers for the life of a patent (20 years) and consider a conservative market expansion, the total would easily exceed $50,000,000, and this amount does not include any punitive damages or attorney's fees/costs.

as the bully and kicked Plaintiff while he's down, has been difficult at almost every opportunity, has tied Plaintiff up for more than 3 ½ years, has misled Plaintiff to believe at multiple different times that they were pursing the ROLOSNIP but in fact was not, kept Plaintiff off the market, didn't bother to tell Plaintiff that they unilaterally decided not to move forward until AFTER they had already breached 3 times and AFTER the first MRR was due more than a year later, approached one of Plaintiff's officers who they knew had a fiduciary duty to Plaintiff and tried to bribe and/or blackmail him into signing a fraudulent document for the purpose of bettering Defendant's position in litigation against Plaintiff and now, further disrespects the Parties contract, the laws of the US and the highest court in our country, the US Supreme Court by filing an improper lawsuit in Texas.   I doubt these are the characteristics that a big box chain store, like Lowe's, would want in their Manufacturer of the Year!

## COUNT I
## ACTUAL FRAUD
## (O.C.G.A §23-2-51)

19.   Plaintiff repeats and realleges each and every allegation contained hereinabove in paragraphs 1 through 18, inclusive, as though set forth entirely herein

32

and further states:

20.    At the time Defendant made the below promises to Plaintiff, Defendant

never intended to fulfill said promises but instead agreed to Plaintiff's request simply

to keep Plaintiff interested and to give Plaintiff a false sense of security for the

purpose of locking in an exclusive license from Plaintiff for Defendant to be the only

manufacturer and seller of the ROLOSNIP, knowing that others at the time that were

showing interests in the ROLOSNIP would move on once Defendant was successful

in its quest; as such, Defendant knew that the following representations made by

Defendant to Plaintiff were false:

(a)    Defendant will have the ROLOSNIP manufactured and in stores by the 2011

Winter Holiday Season;

(b)    Defendant has "unsurpassed speed to market" and can get the ROLOSNIP to

market quicker than any other manufacturer;

(c)    Defendant will timely manufacturer the ROLOSNIP to support Plaintiff's

retained rights to sell the ROLOSNIP via television and/or the Internet, wherein

Plaintiff can purchase as many as Plaintiff needs from Defendant at COG plus 10%;

(d)    Defendant has the capacity to produce as many ROLOSNIPS as needed;

(e)    Defendant has a great relationship with Lowe's and thus, will be able to get the

ROLOSNIP into Lowe's ASAP;

(f)     Defendant will spend the necessary funds to have the final engineering needed on the ROLOSNIP completed and to have it mass produced;

(g)     Defendant has the expertise to finalize the engineering needed;

(h)     Defendant is a family owned business with the utmost integrity and has the "simple philosophy of doing what is right"; and

(i)     Defendant will use its "Best Effort" to complete the engineering, manufacture, shipping and selling of the ROLOSNIP and its other obligations under Agreement I and Agreement II.

21.     Defendant intended for Plaintiff to rely on said false statements and to act (enter into Agreement I & II, stop seeking a manufacturers and investors, grant Defendant exclusive rights), and Plaintiff, in reasonable reliance thereon, did in fact act as specified herein.

22.     Consequently, Plaintiff suffered from and seeks recovery for financial damages by reason of Defendant's false statements including, but not limited to, failure to enjoy the benefits of the bargain, loss profits, consequential damages, lost opportunity, costs and expenses incurred relating to the parties agreements, litigation

34

costs and attorney's fees, punitive damages (to punish and deter Defendant from repeating his intentional torts) and any other damages this Court or a Jury deem appropriate for Defendant's willful, wonton and malicious fraudulent acts.

23.    The actions of Defendant were in bad faith, constitute stubborn litigiousness, and/or have put Plaintiff to unnecessary trouble and expense, such that Plaintiff is entitled to recover from Defendant for his costs of litigation, including reasonable attorney's fees, pursuant to O.C.G.A. §13-6-11.

## COUNT II
## CONSTRUCTIVE FRAUD
## (O.C.G.A §23-2-51)

24.    Plaintiff repeats and realleges each and every allegation contained hereinabove in paragraphs 1 through 23, inclusive, as though set forth entirely herein and further states:

25.    At the time Defendant made the below promises to Plaintiff, Defendant was under a legal duty to act in good faith; however, Defendant recklessly or

negligently made promises that it wasn't willing to or able to fulfill, wherein said reckless or negligent promises were contrary to Defendant's legal duty and contrary to good conscious:

(a)     Defendant will have the ROLOSNIP manufactured and in stores by the 2011 Winter Holiday Season;

(b)     Defendant has "unsurpassed speed to market" and can get the ROLOSNIP to market quicker than any other manufacturer;

(c)     Defendant will timely manufacturer the ROLOSNIP to support Plaintiff's retained rights to sell the ROLOSNIP via television and/or the Internet, wherein Plaintiff can purchase as many as Plaintiff needs from Defendant at COG plus 10%;

(d)     Defendant has the capacity to produce as many ROLOSNIPS as needed;

(e)     Defendant has a great relationship with Lowe's and thus, will be able to get the ROLOSNIP into Lowe's ASAP;

(f)     Defendant will spend the necessary funds to have the final engineering needed on the ROLOSNIP completed and to have it mass produced;

(g)     Defendant has the expertise to finalize the engineering needed;

(h)     Defendant is a family owned business with the utmost integrity and has the "simple philosophy of doing what is right"; and

(i)     Defendant will use its "Best Effort" to complete the engineering, manufacture,

36

shipping and selling of the ROLOSNIP and its other obligations under Agreement I and Agreement II.

26. While under a legal duty, Defendant failed to inform Plaintiff that Defendant decided, unilaterally, to place the ROLOSNIP on hold and pursue other priorities contrary to Defendant's legal duty and contrary to good conscious.

27. Consequently, Defendant's said acts and omissions operated to injure Plaintiff and Plaintiff now seeks recovery for financial damages by reason of Defendant's constructive fraud including, but not limited to, failure to enjoy the benefits of the bargain, loss profits, consequential damages, lost opportunity, exemplary, costs and expenses incurred relating to the parties agreements, litigation costs and attorney's fees, punitive damages and any other damages this Court or a Jury deem appropriate for Defendant's fraudulent acts.

28. The actions of Defendant were in bad faith, constitute stubborn litigiousness, and/or have put Plaintiff to unnecessary trouble and expense, such that Plaintiff is entitled to recover from Defendant for his costs of litigation, including reasonable attorney's fees, pursuant to O.C.G.A. §13-6-11.

37

## COUNT III
## MISREPRESENTATION
## (O.C.G.A. §23-2-52)

34.    Plaintiff repeats and realleges each and every allegation contained

hereinabove in paragraphs 1 through 33, inclusive, as though set forth entirely herein

and further states:

35.    At the time Defendant made the below misrepresentations of material

fact to Plaintiff, Defendant did so willfully to deceive Plaintiff or recklessly without

knowledge or innocently and mistakenly:

(a)    Defendant will have the ROLOSNIP manufactured and in stores by the 2011

Winter Holiday Season;

(b)    Defendant has "unsurpassed speed to market" and can get the ROLOSNIP to

market quicker than any other manufacturer;

(c)    Defendant will timely manufacturer the ROLOSNIP to support Plaintiff's

retained rights to sell the ROLOSNIP via television and/or the Internet, wherein

Plaintiff can purchase as many as Plaintiff needs from Defendant at COG plus 10%;

(d)    Defendant has the capacity to produce as many ROLOSNIPS as needed;

38

(e)     Defendant has a great relationship with Lowe's and thus, will be able to get the ROLOSNIP into Lowe's ASAP;

(f)     Defendant will spend the necessary funds to have the final engineering needed on the ROLOSNIP completed and to have it mass produced;

(g)     Defendant has the expertise to finalize the engineering needed;

(h)     Defendant is a family owned business with the utmost integrity and has the "simple philosophy of doing what is right"; and

(i)     Defendant will use its "Best Effort" to complete the engineering, manufacture, shipping and selling of the ROLOSNIP and its other obligations under Agreement I and Agreement II.

        36.     Plaintiff reasonably acted on said misrepresentations as specified herein.

        37.     Consequently, Plaintiff suffered from and seeks recovery for financial damages by reason of Defendant's misrepresentations including, but not limited to, failure to enjoy the benefits of the bargain, loss profits, consequential damages, lost opportunity, costs and expenses incurred relating to the parties agreements, litigation costs and attorney's fees and any other damages this Court or a Jury deem appropriate for Defendant's willful, wonton and malicious fraudulent acts.

                                        39

38.     The actions of Defendant were in bad faith, constitute stubborn

litigiousness, and/or have put Plaintiff to unnecessary trouble and expense, such

that Plaintiff is entitled to recover from Defendant for his costs of litigation,

including reasonable attorney's fees, pursuant to O.C.G.A. §13-6-11.

## COUNT IV
## GEORGIA RICO ACT
## (O.C.G.A. §16-14-4)

39.     Plaintiff repeats and realleges each and every allegation contained

hereinabove in paragraphs 1 through 38, inclusive, as though set forth entirely herein

and further states:

40.     Defendant on at least two separate occasions, approached Robert

Adams, an Officer of Plaintiff, and tried to extort and/or bribe him into altering

evidence, creating false evidence and/or influencing false testimony by him and/or

Plaintiff and/or to interfere with Plaintiff's pursuit of justice against Defendant so

that Defendant could improperly acquire or maintain any interest in or control of the

exclusive manufacturing and selling rights of the ROLOSNIP and of monies in Defendant's possession and/or control that is rightfully Plaintiff's monies.

41. Defendant, by said repeated illegal actions has, at a minimum, conspired or endeavor to violate O.C.G.A. § 16-14-4 (a) and (b) and thus, is guilty of violating the Georgia RICO Act.

42. Pursuant to O.C.G.A. § 16-14-6(a)(1), Plaintiff respectfully request that this Court issue an Order requiring Defendant to divest itself of monies in its possession that is rightfully Plaintiff's.

43. Pursuant to O.C.G.A. § 16-14-6(a)(2), Plaintiff respectfully request that this Court issue an Order permanently restricting Defendant from, directly or indirectly, investing in, owning, operating or assisting others in owning or operating any business in the United States that is related to Plaintiff's ROLOSNIP technology or any sniping or shearing tools.

44. On information and belief, Defendant's President and Defendant's CEO were both engaged in the violations of the Georgia RICO Act as detailed above, and

as such, for the prevention of future criminal activity, the public interest requires that

Defendant's Certificate of Authorization to do business within the State of Georgia

be permanently revoked. Therefore, pursuant to O.C.G.A. § 16-14-6(a)(5), Plaintiff

respectfully request that this Court issue an Order to the Georgia Secretary of State

permanently revoking Defendant's Foreign Certificate of Authorization to do work

within the State of Georgia and an Order to Defendant to permanently enjoin

Defendant from doing business any where in the State of Georgia, wherein violation

of same immediately subjects the CEO and the President of Defendant to criminal

contempt to the fullest extent permitted by law.

45.    Pursuant to O.C.G.A. § 16-14-6(c), Plaintiff is entitled to three (3) times

its actual damages incurred, punitive damages, its reasonable attorney's fees and all

litigation expenses incurred and as such, Plaintiff respectfully requests this Court for

same.

46.    Plaintiff hereby reserves its claim and right to any forfeited property or

proceeds therefrom superior to any other party's claim or right thereto.

47.    The actions of Defendant were in bad faith, constitute stubborn

42

litigiousness, and/or have put Plaintiff to unnecessary trouble and expense, such

that Plaintiff is entitled to recover from Defendant for its costs of litigation,

including reasonable attorney's fees, pursuant to O.C.G.A. §13-6-11.

## COUNT V
## FEDERAL RICO ACT
## (18 U.S.C. § 1961 et seq.)

48.    Plaintiff repeats and realleges each and every allegation contained

hereinabove in paragraphs 1 through 47, inclusive, as though set forth entirely herein

and further states:

49.    Defendant on at least two separate occasions, approached Robert

Adams, an Officer of Plaintiff, and tried to extort and/or bribe him into altering

evidence, creating false evidence and/or influencing false testimony by him and/or

Plaintiff and/or to interfere with Plaintiff's pursuit of justice against Defendant so

that Defendant could improperly acquire or maintain any interest in or control of the

exclusive manufacturing and selling rights of the ROLOSNIP and of monies in

Defendant's possession and/or control that is rightfully Plaintiff's monies.

43

50.     Defendant, by said repeated illegal actions, has, at a minimum, conspired or endeavor to violate 18 U.S.C. § 1961 and thus, is guilty of violating the Federal RICO Act.

51.     Pursuant to 18 U.S.C. § 1964, Plaintiff respectfully request that this Court issue an Order requiring Defendant to divest itself of monies in its possession that is rightfully Plaintiff's.

52.     Pursuant to 18 U.S.C. § 1964, Plaintiff respectfully request that this Court issue an Order permanently restricting Defendant from, directly or indirectly, investing in, owning, operating or assisting others in owning or operating any business in the United States that is related to Plaintiff's ROLOSNIP technology or any sniping or shearing tools.

53.     On information and belief, Defendant's President and Defendant's CEO were both engaged in the violations of the Georgia RICO Act as detailed above, and as such, for the prevention of future criminal activity, the public interest requires that Defendant's Certificate of Authorization to do business within the State of Georgia be permanently revoked.  Therefore, pursuant to 18 U.S.C. § 1964,  Plaintiff

44

respectfully request that this Court issue an Order to the Georgia Secretary of State permanently revoking Defendant's Foreign Certificate of Authorization to do work within the State of Georgia and an Order to Defendant to permanently enjoin Defendant from doing business any where in the State of Georgia, wherein violation of same immediately subjects the CEO and the President of Defendant to criminal contempt to the fullest extent permitted by law.

54.    Pursuant to 18 U.S.C. § 1964, Plaintiff is entitled to three (3) times its actual damages incurred, punitive damages, its reasonable attorney's fees and all litigation expenses incurred and as such, Plaintiff respectfully requests this Court for same.

55.    Plaintiff hereby reserves its claim and right to any forfeited property or proceeds therefrom superior to any other party's claim or right thereto.

56.    The actions of Defendant were in bad faith, constitute stubborn litigiousness, and/or have put Plaintiff to unnecessary trouble and expense, such that Plaintiff is entitled to recover from Defendant for its costs of litigation, including reasonable attorney's fees, pursuant to O.C.G.A. §13-6-11.

## COUNT VI
## DECEPTIVE OR UNFAIR TRADE PRACTICES
## (O.C.G.A. § 10-1-372 et seq.)

57.    Plaintiff repeats and realleges each and every allegation contained

hereinabove in paragraphs 1 through 56, inclusive, as though set forth entirely herein

and further states:


58.    Pursuant to O.C.G.A. §10-1-372 (a)(5), (a)(7), (a)(8) and (a)(9),

Defendants have engaged in deceptive trade practices to Plaintiff's irreparable

damage.


59.    Defendant has represented to Plaintiff via its websites, in-person, via

email and as reflected in Agreement I and Agreement II that Defendant's goods and

services have characteristics, uses, benefits, or quantities that they do not have;  more

specifically, as a non-exhaustive list, Defendant represented to Plaintiff that its

services were "unsurpassed speed to market"; that one of Defendant's  best service

characteristics was "Speed to Market: Our global presence allows us to optimize

46

logistics and lead-times ..."[16];  Speed to market was and still is one of Defendant's worse service characteristics.

60.    Defendant via in person, via its websites, via its expressed provisions of Agreement I and Agreement II, and via email, has and continues to represent that Defendant's services and goods are of a particular standard and quality.  After wasting 3 ½ years with Plaintiff constantly be advised by Defendant that Defendant's standards and quality are very high but nonetheless, better than typical standards and quality and thus, if Defendant had fulfilled its obligation as required in Agreement I and Agreement II to act in good faith and produce the first shipment within the originally set 8-month period,  Plaintiff would already have $369,000 in guaranteed payments and at least $4,000,000 in profit; however, because Defendant's services have been, to date, at least 5 times worse than the typical standard, and much worse than Defendant represented, Plaintiff has no profit to show, no manufactured ROLOSNIP,  lots of debt and no solution in sight.

61.    Defendant, in an attempt to maliciously CYA itself at the sacrifice of

_____

[16] www.roostermanufacturing.com

Plaintiff reputation, Defendant has and continues to Disparage the goods, services, or business of Plaintiff by false or misleading representation of fact.

62.    Defendant advertises its goods and/or services as having "integrity", only its best efforts used and as "unsurpassed speed to market". When in reality, Defendant intentionally breached every provision in Agreement I and almost every provision in Agreement II, thus placing Plaintiff in an awful financial position and almost destroying Plaintiff as a company, all without an apology from Defendant, a showing of any remorse by Defendant or even an extra effort by Defendant to attempt to rectify the devastating wrongs it has inflicted on the Plaintiff. Defendant kept Plaintiff tied up for 3 ½ years with NO ROLOSNIP to show for all of Plaintiff's efforts. It is clear, consequently, the "integrity" and "speed to market" quality of Defendant's services it promotes as having, was never intended by Defendant to be sold as advertised.

63.    Defendant did many other acts that caused misunderstandings between the Parties. Just to name a few, Defendant tried to bully Plaintiff into giving up various rights; Defendant acted in a malicious and willful manner; Defendant criminally tried to bribe one of Rolosnip's officers to get him to sign a fraudulent

48

document for the benefit of Defendant.

64.    Defendant not only failed to do "what is right" and fulfill its obligations under Agreement I or Agreement II, Defendant did the opposite by intentionally choosing to do what was wrong by its dilatory actions, intentionally not performing its obligations it owes to Plaintiff, intentionally trying to bully Plaintiff, and intentionally trying to force several unilateral amendments upon Plaintiff.

65.    Pursuant to O.C.G.A. § 10-1-373(a), Plaintiff shall be entitled to and thus respectfully request a permanent injunction issue against Defendant to prevent further unfair or deceptive trade practices and thus further damage.

66.    Pursuant to O.C.G.A. § 10-1-373(b), if Plaintiff prevails, Plaintiff shall be entitled to and thus respectfully requests all costs of the present litigation.

67.    Pursuant to O.C.G.A. § 10-1-373(b)(2),  Defendant admitted it intentionally placed the ROLOSNIP on hold in direct violation of the parties' contract without Plaintiff's approval and thus, caused many months of delay, in stark contradiction to one of several Defendant's clearly false advertisements wherein

Defendant presents itself as the fastest company from manufacturing to market saying that their services are "**unsurpassed** speed to market" (emphasis added) and further that "Speed to Market: Our global presence allows us to optimize logistics and lead-times …." *See* Exhibit F1 and F2, Rooster Group False Advertisement. It is clear that Defendant willfully engaged in these unfair and deceptive trade practices knowing it to be deceptive and unfair, and as such, Plaintiff shall be entitled to and thus respectfully requests all of Plaintiff's attorney fees and other costs be awarded.

68. The actions of Defendant were in bad faith, constitute stubborn litigiousness, or have put Plaintiff to unnecessary trouble and expense, such that Plaintiff is entitled to recover from Defendants for its cost of litigation, including reasonable attorney's fees, pursuant to O.C.G.A. §13-6-11.

## COUNT VII
## BREACH OF WRITTEN AGREEMENT I

69. Plaintiff repeats and realleges each and every allegation contained hereinabove in paragraphs 1 through 68 inclusive, as though set forth entirely herein and further states:

50

70.     Defendant and Plaintiff negotiated Agreement I for approximately 9-10 months resulting in both parties agreeing to ALL of the final terms and with consideration entered into a valid contract, signed by both parties, wherein said contract created obligations on both Defendant and Plaintiff. Agreement I was reviewed and negotiated on behalf of Defendant by at least its CEO, Jan Cabrera and its In-House Attorney, Ahab Auoub, Esq.

71.     Defendant failed to perform Defendant's contractual obligations under said contract. More specifically,  Defendant failed to perform ANY of its obligations under Agreement I.

72.     Plaintiff fully performed Plaintiff's contractual obligations under said contract.

73.     By Defendant's actions as detailed above, Defendant has breached the terms of said contract. More specifically, Defendant breached the following provisions of Agreement I:

51

Breach 1)    ¶2.B. Defendant is under an obligation not to take any

action to damage the Goodwill of the ROLOSNIP trademark; as Defendant was

aware that Plaintiff was relying on Defendant's promise and obligation in said

Agreement I to have the ROLOSNIP manufactured and first shipment by July 10,

2012 (8 months as agreed in ¶6). Plaintiff (via Mr. Adams, Mr. Mueller and Mrs.

Adams) were promoting the new release and thus was building the goodwill of the

ROLOSNIP product and trademark. However, as Defendant never moved forward

with design or manufacturing efforts, July 10, 2012 passed with no sign of the

ROLOSNIP and no word from Defendant. It was more than 6 ½ months later, after

Defendant missed the first MMR payment ($18,000 due January 30, 2013 per ¶5)

and after Plaintiff sent a Notice of Material Breach, January 31, 2013, that Plaintiff

was informed by Defendant's Chief Operating Officer, Mindy Abramson, that

Defendant decided, unilaterally (and without notice) to place the ROLOSNIP on hold

because they were busy with a line review at Lowe's and thus decided to prioritize

(at Plaintiff's sacrifice and in the malicious ignorance to the Parties' legal

obligations). Consequently, at that point, it was 7 months past the contractually

agreed shipment date of July 10, 2012, and thus, due to Defendant's massive breach,

Mr. Adams', Mr. Mueller's and Mrs. Adams' efforts and promotions had the opposite

effect, and instead made Mr. Adams, Mr. Mueller and Mrs. Adams look like they

were lying and/or that they were not fully informed. In other words, Defendant's willful failure to fulfill its obligation and malicious decision not to inform Plaintiff has now resulted in the opposite position of what Plaintiff's efforts intended to create. As a direct and proximate result of Defendant's breach of said Agreement I, Plaintiff has suffered and will continue to suffer damages in an amount to be proven at trial or otherwise, but in no event less than the sum of Twenty Nine Million Nine Thousand Four Hundred Seventy and no/100 U.S. Dollars ($29,009,470). Pursuant to O.C.G.A. §13-6-13 or as amended, Plaintiff is entitled to interest from Defendant at the legal rate of seven percent (7%) per annum from the date of breach until judgment or payment;

Breach 2)    ¶3 and ¶4C. Defendant is under an obligation pursuant to Agreement I, ¶3, to make timely Royalty payments to Plaintiff for the term of Agreement I for 10 years and, if not, per ¶4C, make interest payments as stated therein for the term of Agreement I, 10 years. Plaintiff was informed by Defendant's Chief Operating Officer, Mindy Abramson, that Defendant decided, unilaterally (and without notice) to place the ROLOSNIP on hold because they were busy with a line review at Lowe's and thus decided to prioritize (at Plaintiff's sacrifice and in the malicious ignorance to the Parties' legal obligations). Defendant in fact did not make

said Royalty payments and did not make said interest payments and further, did not

cure any of said payments. In other words, Defendant's willful failure to fulfill its

obligations, specifically payment of Royalty Fees and Interest, and malicious

decision NOT to inform Plaintiff has now resulted in substantial damages to Plaintiff.

As a direct and proximate result of Defendant's breach of said Agreement I, Plaintiff

has suffered and will continue to suffer damages in an amount to be proven at trial or

otherwise, but in no event less than the sum of Twenty Nine Million Nine Thousand

Four Hundred Seventy and no/100 U.S. Dollars ($29,009,470). Pursuant to O.C.G.A.

§13-6-13 or as amended, Plaintiff is entitled to interest from Defendant at the legal

rate of seven percent (7%) per annum from the date of breach until judgment or

payment;

Breach 3) ¶5.A and B. Defendant is under an obligation pursuant to

Agreement I, ¶5.A and B, to make quarterly MMR payments starting with the 4th Qtr

2012, followed by 1st Qtr of 2013, 2nd Qtr of 2013, 3rd Qtr 2013, 4th Qtr 2013, 1st Qtr

2014, 2nd Qtr 2014 continued for the term of Agreement I, 10 years. Plaintiff was

informed by Defendant's Chief Operating Officer, Mindy Abramson, that Defendant

decided, unilaterally (and without notice) to place the ROLOSNIP on hold because

they were busy with a line review at Lowe's and thus decided to prioritize (at

54

Plaintiff's sacrifice and in the malicious ignorance to the Parties' legal obligations).
Defendant has, in fact, failed to fulfill said MMR obligations and has failed to cure
same. In other words, Defendant's willful failure to fulfill its obligations,
specifically payment of Royalty Fees, MMR and Interest, and malicious decision
NOT to inform Plaintiff regarding Defendant's decision to place on hold has now
resulted in substantial damages to Plaintiff. As a direct and proximate result of
Defendant's breach of said Agreement I, Plaintiff has suffered and will continue to
suffer damages in an amount to be proven at trial or otherwise, but in no event less
than the sum of Twenty Nine Million Nine Thousand Four Hundred Seventy and
no/100 U.S. Dollars ($29,009,470). Pursuant to O.C.G.A. §13-6-13 or as amended,
Plaintiff is entitled to interest from Defendant at the legal rate of seven percent (7%)
per annum from the date of breach until judgment or payment.


Breach 4)    ¶6.    Defendant is under an obligation pursuant to
Agreement I, ¶6 to have any design work completed and to have any manufacturing
modifications completed so that the first manufacturing run could be made thus
making it possible that the required Milestone - First Shipment could be made by
July 10, 2012; the parties agreed that "time is of the essence" for the contract.
Defendant has failed to meet said July 10, 2012 deadline, has failed to cure same

within 30-days thereafter and in fact, as of the filing of the present lawsuit, June 6,

2014, Defendant still has yet to meet said deadline or any other deadlines. As a

direct and proximate result of Defendant's breach of said Agreement I, Plaintiff has

suffered and will continue to suffer damages in an amount to be proven at trial or

otherwise, but in no event less than the sum of Twenty Nine Million Nine Thousand

Four Hundred Seventy and no/100 U.S. Dollars ($29,009,470).  Pursuant to O.C.G.A.

§13-6-13 or as amended, Plaintiff is entitled to interest from Defendant at the legal

rate of seven percent (7%) per annum from the date of breach until judgment or

payment.


                Breach 5)　¶11.　Defendant is under an obligation pursuant to

Agreement I, ¶11 to conduct itself in a professional manner to maintain the

reputation of the ROLOSNIP in a positive light within the industry.  However,

Defendant's intentional and willful unilateral decision not to proceed, by itself, has

violated this provision by putting the ROLOSNIP in a bad disparaging light.

Defendant's continued breaches of Agreement II adds to the disparagement of the

ROLOSNIP thus causing more damage to Plaintiff.  As a direct and proximate result

of Defendant's breach of said Agreement I, Plaintiff has suffered and will continue to

suffer damages in an amount to be proven at trial or otherwise, but in no event less

than the sum of Twenty Nine Million Nine Thousand Four Hundred Seventy and no/100 U.S. Dollars ($29,009,470).  Pursuant to O.C.G.A. §13-6-13 or as amended, Plaintiff is entitled to interest from Defendant at the legal rate of seven percent (7%) per annum from the date of breach until judgment or payment.

Breach 6)     ¶12.d.     Defendant is under an obligation pursuant to Agreement I, ¶12.d to "maintain responsibility and liability for all quality issues pertaining to the manufacturing and shipment of Product."  The fact that Defendant took NO actions under Agreement I, it certainly has breached ¶12.d  The irony of Defendant's argument that Chief Operating Officer Mindy Abramson presents in an email dated April 8, 2014, is that Defendant has yet to figure out how their clearly fraudulent self-serving email actually serves to prove the truth in the favor of Plaintiff. The facts that she chooses to ignore and/or blatantly lie about further proves many of our intentional tort claims and goes to show Defendant's *Modus Operandi.* It is unfortunate that Defendant has chosen to take such a blatantly obvious illegal path in an attempt to manipulate the Court and to extort forgiveness from Plaintiff for Defendant's multiple failures and intentional acts.  Rooster should be setting an example and actually follow its own marketing for once.  Rooster claims to pride itself on "doing the right thing" and having the utmost integrity.

57

Right now, that could not be further from the truth. As our case proceeds and as

more information becomes available, it will soon be quite apparent. With that said,

there is no question that in Agreement I (negotiated for approximately 9-10 months)

and Agreement II (negotiated approximately 2-3 months) under ¶12.d. Defendant

clearly agreed to "**maintain responsibility and liability for all quality issues**

**pertaining to the manufacturing and shipment of Product.**" There is no truth to

her allegations that Mr. Mueller interfered or created an impossible or unmarketable

tool. In fact, as with many of their liability avoiding attempts, Defendant's facts are

simply just made up to fit an argument. Their argument and presentation would be

better suited for a fictional screenplay; however, even if, arguendo, one plays along,

Defendant is still responsible as Defendant is under a duty to **maintain** the very

**responsibility** and **liability** they claim they gave up to Mr. Mueller. Again, although

not correct, that alone, would further solidify their liability. As such, Defendant has

breached this provision by 1) failing to maintain responsibility and liability for the

manufacturing of the ROLOSNIP. And for failing to maintain responsibility and

liability for shipping. As a direct and proximate result of Defendant's breach of said

Agreement I, Plaintiff has suffered and will continue to suffer damages in an amount

to be proven at trial or otherwise, but in no event less than the sum of Twenty Nine

Million Nine Thousand Four Hundred Seventy and no/100 U.S. Dollars ($29,009,470).  Pursuant to O.C.G.A. §13-6-13 or as amended, Plaintiff is entitled to interest from Defendant at the legal rate of seven percent (7%) per annum from the date of breach until judgment or payment.

Breach 7)     ¶13.A.     Defendant is under an obligation pursuant to Agreement I, ¶13.A to manufacture the ROLOSNIP and allow Plaintiff to purchase from Defendant at its COG + 10%.  Defendant has breached this provision by failing to manufacture the ROLOSNIP and thus failing to have available for Plaintiff to purchase.  As a direct and proximate result of Defendant's breach of said Agreement I, ¶13.A.  Plaintiff has suffered and will continue to suffer damages in an amount to be proven at trial or otherwise, but in no event less than the sum of Twenty Nine Million Nine Thousand Four Hundred Seventy and no/100 U.S. Dollars ($29,009,470).  Pursuant to O.C.G.A. §13-6-13 or as amended, Plaintiff is entitled to interest from Defendant at the legal rate of seven percent (7%) per annum from the date of breach until judgment or payment.

Breach 8)     ¶16.D.     Defendant is under an obligation pursuant to Agreement I, ¶16.D to mail all notices, request, demands and other communications

59

as instructed therein to the address listed therein.  Defendant has and continues to

breach this provision.    As a direct and proximate result of Defendant's breach of

said Agreement I,¶16.D.  Plaintiff has suffered and will continue to suffer damages in

an amount to be proven at trial or otherwise, but in no event less than the sum of

Twenty Nine Million Nine Thousand Four Hundred Seventy and no/100 U.S. Dollars

($29,009,470).  Pursuant to O.C.G.A. §13-6-13 or as amended, Plaintiff is entitled to

interest from Defendant at the legal rate of seven percent (7%) per annum from the

date of breach until judgment or payment.


Breach 9)  ¶16.L.  Defendant is under an obligation pursuant to

Agreement I, ¶16.L. to use its Best Efforts to Market, Promote and Generate Sales

and to use Sufficient Funding to Market and Promote the ROLOSNIP.  Defendant

has utterly failed and breached every duty of this provision. As a direct and

proximate result of Defendant's breach of said Agreement I,¶16.L.  Plaintiff has

suffered and will continue to suffer damages in an amount to be proven at trial or

otherwise, but in no event less than the sum of Twenty Nine Million Nine Thousand

Four Hundred Seventy and no/100 U.S. Dollars ($29,009,470).  Pursuant to O.C.G.A.

§13-6-13 or as amended, Plaintiff is entitled to interest from Defendant at the legal

rate of seven percent (7%) per annum from the date of breach until judgment or

payment.

Breach 10)  ¶16.M.    Defendant is under a forum selection clause,
wherein both sophisticated parties negotiated the terms and mutually agreed that if
there was a dispute as to either Agreement I or II, the parties agreed to any Court in
Georgia, and that Georgia law would apply.  However, as further evidencing
Defendant's stubbornly litigious practices, their arrogance as to the legal system, and
their willingness to completely disrespect what the parties have legally agreed to and
are bound by, Defendant files in Texas a lawsuit against Plaintiff.  As a further slap
on the face of our legal system, is the fact that any attorney practicing litigation in
Texas should be familiar with the recent (Dec 2013) U.S. Supreme Court Case,
Atlantic Marine, as the ruling was directed at a Texas Court that ignored a forum
selection provision in the parties' contract.  The U.S. Supreme Court ruled that courts
should respect and honor a forum selection provision in a contract that the parties
negotiated and wanted same.  In the Texas filing by Defendant, they don't even
bother to let the court know that there is an agreed upon forum clause.  Defendant
has clearly will malice and intent breached this provision.    As a direct and
proximate result of Defendant's breach of said Agreement I,¶16.M.  Plaintiff has
suffered and will continue to suffer damages in an amount to be proven at trial or

otherwise, but in no event less than the sum of Twenty Nine Million Nine Thousand

Four Hundred Seventy and no/100 U.S. Dollars ($29,009,470). Pursuant to O.C.GA.

§13-6-13 or as amended, Plaintiff is entitled to interest from Defendant at the legal

rate of seven percent (7%) per annum from the date of breach until judgment or

payment.

75.    The actions of Defendant were in bad faith, constitute stubborn

litigiousness, or have put Plaintiff to unnecessary trouble and expense, such

that Plaintiff is entitled to recover from Defendant for its cost of litigation,

including reasonable attorney's fees, pursuant to O.C.GA. §13-6-11.

## COUNT VIII
## BREACH OF WRITTEN AGREEMENT II

76.    Plaintiff repeats and realleges each and every allegation contained

hereinabove in paragraphs 1 through 75, inclusive, as though set forth

entirely herein and further states:

77.    Defendant and Plaintiff negotiated Agreement II (a written amendment

to Agreement I) approximately 4-5 months resulting in both parties agreeing to ALL terms and with consideration entered into a valid contract, signed by both parties, wherein said contract created obligations on both Defendant and Plaintiff. Agreement II was negotiated on behalf of Defendant, at least in part, by its Chief Operating Officer, Mindy Abramson, its Chief Executive Officer, Jan Cabrera, and one of its attorneys, Ray Jeffrey, Esq.

78.    Defendant failed to perform almost all of Defendant's new contractual obligations under said contract: 3B, 3C, 3E, and 3G, as more fully delineated below.

79.    Plaintiff performed all of Plaintiff's required contractual obligations under said contract.

80.    By Defendant's actions as detailed above, Defendant has breached the terms of said contract. More specifically, Defendant breached the following provisions of Agreement II:

Breach 1)    ¶2.B. Defendant is under an obligation not to take any action to damage the Goodwill of the ROLOSNIP trademark; as Defendant was

63

aware that Plaintiff was relying on Defendant's promise and obligation in said Agreement II to have the ROLOSNIP manufactured and first shipment no later than February 7, 2014 (this date includes the 5 months plus the 30-day cure period as agreed in ¶3B of Amendment). Plaintiff (via Mr. Adams, Mr. Mueller and Mrs. Adams) were again promoting the release of the ROLOSNIP and thus was building the goodwill of the ROLOSNIP product and trademark. However, as Defendant failed to complete the manufacturing efforts, February 7, 2014, passed with, again, the ROLOSNIP not being manufactured and again, no word from Defendant. Nothing was heard back from Defendant until after Plaintiff sent an email explaining its consternation on April 11, 2014, and asked for status update. So instead of providing Plaintiff with an update or a requested new schedule or even an apology, in response, Defendant improperly and with malice files a lawsuit in Texas despite the fact the parties have an agreed upon forum selection clause for courts in Georgia. Consequently, Plaintiff's efforts and promotions had the opposite effect, and instead made Plaintiff look like it was lying and/or that it was not fully informed. In other words, Defendant's willful failure to fulfill its obligation and malicious decision not to inform Plaintiff has now resulted in the opposite position of what Plaintiff's efforts intended to create. As a direct, foreseeable and proximate result of Defendant's breach of said Agreement II, Plaintiff has suffered and will continue to

suffer damages in an amount to be proven at trial or otherwise, but in no event less than the sum of Twenty Nine Million Nine Thousand Four Hundred Seventy and no/100 U.S. Dollars ($29,009,470). Pursuant to O.C.G.A. §13-6-13 or as amended, Plaintiff is entitled to interest from Defendant at the legal rate of seven percent (7%) per annum from the date of breach until judgment or payment;

Breach 2)    ¶3D and E.  Defendant is under an obligation pursuant to Agreement I, ¶3D and E (amendment), to pay for a round trip airfare for Kristopher Mueller to Defendant's manufacturer in China and all reasonable expenses by September 5, 2013 and to pay for an additional prototype up to $5000 by August 16, 2013.  Defendant agreed that time was of the essence.  Defendant failed to meet these deadlines.  As a direct, foreseeable and proximate result of Defendant's breach of said Agreement II, Plaintiff has suffered and will continue to suffer damages in an amount to be proven at trial or otherwise, but in no event less than the sum of Twenty Nine Million Nine Thousand Four Hundred Seventy and no/100 U.S. Dollars ($29,009,470).  Pursuant to O.C.G.A. §13-6-13 or as amended, Plaintiff is entitled to interest from Defendant at the legal rate of seven percent (7%) per annum from the date of breach until judgment or payment;

Breach 3)     ¶3.G.  Defendant is under an obligation pursuant to

Agreement II, ¶3.G (amendment), to provide monthly progress and expenditure

reports starting August 30, 2013 and continue until the first shipment showing the

progress and expenditures by Defendant.  This provision was required by Plaintiff in

Agreement II as a result of Plaintiff taking no action under Agreement I.  As of the

filing of the present action, Defendant has missed ten (10) out ten (10) of the

required progress reports.  As a direct, foreseeable and proximate result of

Defendant's breach of said Agreement II, Plaintiff has suffered and will continue to

suffer damages in an amount to be proven at trial or otherwise, but in no event less

than the sum of Twenty Nine Million Nine Thousand Four Hundred Seventy and

no/100 U.S. Dollars ($29,009,470).  Pursuant to O.C.G.A. §13-6-13 or as amended,

Plaintiff is entitled to interest from Defendants at the legal rate of seven percent (7%)

per annum from the date of breach until judgment or payment.


Breach 4)     ¶6.     Defendant is under an obligation pursuant to

Agreement II, ¶6 and to ¶3.B. (amendment) to  have the design finalized and the

manufacturing completed so that the First Shipment to the US can be made no later

than February 7, 2014.  As of the filing of the present action, Defendant has failed to

finalize the design, complete the first manufacturing run, ship any of said product or

have placed any of said product in stores. As a direct, foreseeable and proximate

result of Defendant's breach of said Agreement II, Plaintiff has suffered and will

continue to suffer damages in an amount to be proven at trial or otherwise, but in no

event less than the sum of Twenty Nine Million Nine Thousand Four Hundred

Seventy and no/100 U.S. Dollars ($29,009,470). Pursuant to O.C.G.A. §13-6-13 or

as amended, Plaintiff is entitled to interest from Defendant at the legal rate of seven

percent (7%) per annum from the date of breach until judgment or payment.


Breach 5)    ¶11.    Defendant is under an obligation pursuant to

Agreement II, ¶11 to conduct itself in a professional manner to maintain the

reputation of the ROLOSNIP in a positive light within the industry. However,

Defendant's intentional and willful unilateral decision not to proceed, in and of itself,

has violated this provision by putting the ROLOSNIP in a bad disparaging light.

Defendant's continued breaches of Agreement II adds to the disparagement of the

ROLOSNIP thus causing more damage to Plaintiff. As a direct, foreseeable and

proximate result of Defendant's breach of said Agreement II, Plaintiff has suffered

and will continue to suffer damages in an amount to be proven at trial or otherwise,

but in no event less than the sum of Twenty Nine Million Nine Thousand Four

Hundred Seventy and no/100 U.S. Dollars ($29,009,470). Pursuant to O.C.G.A. §13-

6-13 or as amended, Plaintiff is entitled to interest from Defendant at the legal rate of seven percent (7%) per annum from the date of breach until judgment or payment.

Breach 6)   ¶12.d.   Defendant is under an obligation pursuant to Agreement II, ¶12.d to "maintain responsibility and liability for all quality issues pertaining to the manufacturing and shipment of Product." The fact that Defendant took NO actions under Agreement II, it certainly has breached ¶12.d The irony of Defendant's argument that Chief Operating Officer Mindy Abramson presents in an email dated April 8, 2014, is that Defendant has yet to figure out how their clearly fraudulent self-serving email actually serves to prove the truth in the favor of Plaintiff. The facts that she chooses to ignore and/or blatantly lie about further proves many of our intentional tort claims and goes to show Defendant's *Modus Operandi.* It is unfortunate that Defendant has chosen to take such a blatantly obvious illegal path in an attempt to manipulate the Court and to extort forgiveness from Plaintiff for Defendant's multiple failures and intentional acts. Rooster should be setting an example and actually follow its own marketing for once. Rooster claims to pride itself on "doing the right thing" and having the utmost integrity. Right now, that could not be further from the truth. As our case proceeds and as more information becomes available, it will soon be quite apparent. With that said,

68

there is no question that in Agreement I (negotiated for approximately 9-10 months) and Agreement II (negotiated approximately 2-3 months) under ¶12.d. Defendant clearly agreed to "**maintain responsibility and liability for all quality issues pertaining to the manufacturing and shipment of Product.**"   There is no truth to her allegations that Mr. Mueller interfered or created an impossible or unmarketable tool.  In fact, as with many of their liability avoiding attempts, Defendant's facts are simply just made up to fit an argument; the truth is exactly the opposite of what Defendant claims.  Their argument and presentation would be better suited for a Fictional screenplay; however, even if, arguendo, one plays along, Defendant is still responsible as Defendant is under a duty to **maintain** the very **responsibility** and **liability** they claim they gave up to Mr. Mueller.  Again, although not correct, that alone, would further solidify their liability.  As such, Defendant has breached this prevision by 1) failing to maintain responsibility and liability for the manufacturing of the ROLOSNIP. And for failing to maintain responsibility and liability for shipping.  As a direct, foreseeable and proximate result of Defendant's breach of said Agreement II, Plaintiff has suffered and will continue to suffer damages in an amount to be proven at trial or otherwise, but in no event less than the sum of Twenty Nine Million Nine Thousand Four Hundred Seventy and no/100 U.S. Dollars

69

($29,009,470). Pursuant to O.C.G.A. §13-6-13 or as amended, Plaintiff is entitled to interest from Defendant at the legal rate of seven percent (7%) per annum from the date of breach until judgment or payment.

Breach 7) ¶13.A. Defendant is under an obligation pursuant to Agreement II, ¶13.A to manufacture the ROLOSNIP and allow Plaintiff to purchase from Defendant at its COG + 10%. Defendant has breached this provision by failing to manufacture the ROLOSNIP and thus failing to have available for Plaintiff to purchase. As a direct, foreseeable and proximate result of Defendant's breach of said Agreement II,¶13.A., Plaintiff has suffered and will continue to suffer damages in an amount to be proven at trial or otherwise, but in no event less than the sum of Twenty Nine Million Nine Thousand Four Hundred Seventy and no/100 U.S. Dollars ($29,009,470). Pursuant to O.C.G.A. §13-6-13 or as amended, Plaintiff is entitled to interest from Defendant at the legal rate of seven percent (7%) per annum from the date of breach until judgment or payment.

Breach 8) ¶16.D. Defendant is under an obligation pursuant to Agreement I, ¶16.D to mail all notices, request, demands and other communications as instructed therein to the address listed therein. Defendant has and continues to

70

breach this provision.    As a direct, foreseeable and proximate result of Defendant's breach of said Agreement II,¶16.D.,  Plaintiff has suffered and will continue to suffer damages in an amount to be proven at trial or otherwise, but in no event less than the sum of Twenty Nine Million Nine Thousand Four Hundred Seventy and no/100 U.S. Dollars ($29,009,470).  Pursuant to O.C.G.A. §13-6-13 or as amended, Plaintiff is entitled to interest from Defendant at the legal rate of seven percent (7%) per annum from the date of breach until judgment or payment.

Breach 9)  ¶16.L.  Defendant is under an obligation pursuant to Agreement II, ¶16.L. to use its Best Efforts to Market, Promote and Generate Sales and to use Sufficient Funding to Market and Promote the ROLOSNIP.  Defendant has utterly failed and breached every duty of this provision. As a direct, foreseeable and proximate result of Defendant's breach of said Agreement II,¶16.L.,  Plaintiff has suffered and will continue to suffer damages in an amount to be proven at trial or otherwise, but in no event less than the sum of Twenty Nine Million Nine Thousand Four Hundred Seventy and no/100 U.S. Dollars ($29,009,470).  Pursuant to O.C.G.A. §13-6-13 or as amended, Plaintiff is entitled to interest from Defendant at the legal rate of seven percent (7%) per annum from the date of breach until judgment or payment.

71

Breach 10) ¶16.M.    Defendant is under a forum selection clause,
wherein both sophisticated parties negotiated the terms and mutually agreed that if
there was a dispute as to either Agreement I or II, the parties agreed to any Court in
Georgia, and that Georgia law would apply.  However, as further evidencing
Defendant's stubbornly litigious practices, their arrogance as to the legal system, and
their willingness to completely disrespect what the parties have legally agreed to and
are bound by, Defendant files in Texas a lawsuit against Plaintiff.  As a further slap
on the face of our legal system, is the fact that any attorney practicing litigation in
Texas should be familiar with the recent (Dec 2013) U.S. Supreme Court Case,
Atlantic Marine, as the ruling was directed at a Texas Court that ignored a forum
selection provision in the parties' contract. The U.S. Supreme Court ruled that courts
should respect and honor a forum selection provision in a contract that the parties
negotiated and wanted same.  In the Texas filing by Defendant, they don't even
bother to let the court know that there is an agreed upon forum clause.  Defendant
has clearly with malice and intent breached this provision.    As a direct, foreseeable
and proximate result of Defendant's breach of said Agreement II,¶16.M.,  Plaintiff
has suffered and will continue to suffer damages in an amount to be proven at trial or
otherwise, but in no event less than the sum of Twenty Nine Million Nine Thousand

72

Four Hundred Seventy and no/100 U.S. Dollars ($29,009,470). Pursuant to O.C.G.A.
§13-6-13 or as amended, Plaintiff is entitled to interest from Defendants at the legal
rate of seven percent (7%) per annum from the date of breach until judgment or
payment.

81.    The actions of Defendant were in bad faith, constitute stubborn
litigiousness, or have put Plaintiff to unnecessary trouble and expense, such
that Plaintiff is entitled to recover from Defendant for its cost of litigation,
including reasonable attorney's fees, pursuant to O.C.G.A. §13-6-11.

## COUNT IX
## WILLFUL, WANTON AND MALICIOUS
## BREACH OF WRITTEN AGREEMENT I

82.    Plaintiff repeats and realleges each and every allegation contained
hereinabove in paragraphs 1 through 81, inclusive, as though set forth entirely herein
and further states:

83.    Defendant and Plaintiff entered into a valid contract on November 10,
2011 (Agreement I), wherein said Agreement I created obligations of both Defendant

73

and Plaintiff.

84.    Defendant willfully, wantonly and with malice to injure Plaintiff, failed
to perform Defendant's contractual obligations under said Agreement I.

85.    Plaintiff fully performed Plaintiff's contractual obligations under said
Agreement I.

86.    By Defendant's actions as detailed herein, Defendant has willfully with
malice to injure Plaintiff breached the terms of said Agreement I.

87.    As a direct and proximate result of Defendant's breach of said
Agreement I, Plaintiff has suffered and will continue to suffer damages in an amount
to be proven at trial, but in no event less than the sum of Twenty Nine Million Nine
Thousand Four Hundred Seventy and no/100 U.S. Dollars ($29,009,470) plus
treble/punitive damages of Eighty Seven Million Twenty Eight Thousand Four
Hundred Ten and no/100 U.S. Dollars ($87,028,410) for a total of not less than One
Hundred Sixteen Million Thirty Seven Thousand Eight Hundred Eighty and no/100
U.S. Dollars ($116,037,880) and other damages this Court deems appropriate for

Defendant's multiple willful and malicious breaches. Pursuant to O.C.G.A. §13-6-13 or as amended, Plaintiff is entitled to interest from Defendant at the legal rate of seven percent (7%) per annum from the date of breach until judgment or payment.

88.     The actions of Defendant were in bad faith, constitute stubborn litigiousness, or have put Plaintiff to unnecessary trouble and expense, such that Plaintiff is entitled to recover from Defendant for its cost of litigation, including reasonable attorney's fees, pursuant to O.C.G.A. §13-6-11.

**COUNT X**
**WILLFUL, WANTON AND MALICIOUS**
**BREACH OF WRITTEN AGREEMENT II**

89.     Plaintiff repeats and realleges each and every allegation contained hereinabove in paragraphs 1 through 88 inclusive, as though set forth entirely herein and further states:

90.     Defendant and Plaintiff entered into a valid amendment/contract on August 6, 2013 (Agreement II), wherein said Agreement II created and continued obligations of both Defendant and Plaintiff.

75

91.    Defendant failed to perform Defendant's contractual obligations under said Agreement II.

92.    Plaintiff fully performed Plaintiff's contractual obligations under said Agreement II.

93.    By Defendant's actions as detailed above, Defendant has breached the terms of said Contract.

94.    As a direct and proximate result of Defendant's breach of said Agreement II, Plaintiff has suffered and will continue to suffer damages in an amount to be proven at trial, but in no event less than the sum of Twenty Nine Million Nine Thousand Four Hundred Seventy and no/100 U.S. Dollars ($29,009,470) plus treble/punitive damages of Eighty Seven Million Twenty Eight Thousand Four Hundred Ten and no/100 U.S. Dollars ($87,028,410) for a total of not less than One Hundred Sixteen Million Thirty Seven Thousand Eight Hundred Eighty and no/100 U.S. Dollars ($116,037,880) and other damages this Court deems appropriate for Defendant's multiple willful and malicious breaches.  Pursuant to O.C.G.A. §13-6-13

76

or as amended, Plaintiff is entitled to interest from Defendant at the legal rate of

seven percent (7%) per annum from the date of breach until judgment or payment.

94.     The actions of Defendant were in bad faith, constitute stubborn

litigiousness, or have put Plaintiff to unnecessary trouble and expense, such

that Plaintiff is entitled to recover from Defendant for its cost of litigation,

including reasonable attorney's fees, pursuant to O.C.G.A. §13-6-11.

## COUNT XI
## QUANTUM MERUIT

96.     Plaintiff repeats and realleges each and every allegation contained

hereinabove in paragraphs 1 through 95, inclusive, as though set forth entirely herein

and further states:

97.     The services and rights rendered by Plaintiff to Defendant pursuant to

the Agreements I and II were of value to Defendant and were accepted by Defendant.

98.     Defendant has failed to remit payment in full for the reasonable

value of services rendered by Plaintiff to Defendant pursuant to Agreement I and II.

99. In the alternative to damages for breach of contract as alleged in Count VII and VIII, Defendant is liable to Plaintiff for the reasonable value of the services and rights rendered by Plaintiff pursuant to Agreement I and II which remain unpaid by Defendant.

100. The actions of Defendant were in bad faith, constitute stubborn litigiousness, or have put Plaintiff to unnecessary trouble and expense, such that Plaintiff is entitled to recover from Defendant for its cost of litigation, including reasonable attorney's fees, pursuant to O.C.G.A. §13-6-11.

## COUNT XII
## TORTUOUS INTERFERENCE WITH BUSINESS RELATIONSHIP

101. Plaintiff repeats and realleges each and every allegation contained hereinabove in paragraphs 1 through 100, inclusive, as though set forth entirely herein and further states:

78

102. Prior to Plaintiff and Defendant's initial discussions of the ROLOSNIP, Robert Adams was and has continued to be an officer of Plaintiff, Rolosnip, LLC and thus had and continues have a fiduciary duty to Rolosnip, LLC. Additionally, Mr. Adams had and continues to have a business relations with Rolosnip, LLC. Said fiduciary duty and business relations existed prior to discussions with Defendant regarding the ROLOSNIP and continued during the time frame at issue in the present case (January 2011 - Present). Mr. Adams role with Plaintiff is a critical role that is essential for Plaintiff; Defendant knew of said role by Mr. Adams.

103. From the initial meeting between Defendant and Plaintiff, Defendant was apprised of Mr. Adams position and business relations with Plaintiff.

104. After Defendant received Plaintiff's Notice of Breach Letter for failing to to perform under Agreement I, Defendant, acting without privilege, improperly approached Mr. Adams and attempted to coerce and/or bribe him into signing a fraudulent document created by Defendant that would act fraudulently to support a defense that Defendant did not breach and/or would act fraudulently to support a defense that Plaintiff waived or released Defendant's breaches. On information and belief, Defendant on more than this one occasion, has approached Mr. Adams for the

purpose of improperly coercing Mr. Adams to act in a manner repugnant to and in violation of his fiduciary duties to Plaintiff and their business relations[17].

105. Defendant acted purposefully and maliciously with the intent to injure Plaintiff.

106. The business relations between Plaintiff and Mr. Adams has been adversely affected by Defendant's improper acts, and thus, Defendant has tortuously interfered with the business relations and fiduciary duties between Mr. Adams and Plaintiff thus, Plaintiff has suffered injury as a result of Defendant's intentional tort. Plaintiff should be entitled to its actual damages plus 3x actual damages as punitive.

107. The actions of Defendant were in bad faith, constitute stubborn litigiousness, and/or have put Plaintiff to unnecessary trouble and expense, such that Plaintiff is entitled to recover from Defendant for his costs of litigation, including reasonable attorney's fees, pursuant to O.C.G.A. §13-6-11.

---

[17] As will be determined through the discovery process, Defendant's purpose may have been, *inter alia*, for the following wrongs: espionage, sabotage, perjury, and evidence tampering.

## COUNT XIII
## FALSE ADVERTISING PURSUANT TO THE LANHAM ACT § 43(A)
## (15 U.S.C. § 1125(a)(1)(B))

108.   Plaintiff repeats and realleges each and every allegation contained hereinabove in paragraphs 1 through 107 inclusive, as though set forth entirely herein and further states:

109.   Defendant advertises its services on its websites at www.roostergroup.com[18] and www.roostermanufacturing.com and states that Defendant is the **"leaders in ... integrity"**; that Defendant has the **"simple philosophy of doing what is right"**; **"Speed to Market: Our global presence allows us to optimize logistics and lead-times ..."**; that **"If you are looking for a partner with the experience to get your products to market on time and in excellent condition, please contact us"**;  and that Defendant has **"unsurpassed speed to market"**.

---

[18] Prior to entering into Agreement I with Defendant, Plaintiff, in performing its due diligence regarding Defendant, researched the Defendant's website www.roostergroup.com and read all the material thereon, including the false advertisements, and relied thereon as part of its basis in deciding to partner with Defendant.

110. These statements are a false or misleading description of fact and/or a false or misleading representation of fact which misrepresents the nature, characteristics or quality of Defendant's services or commercial activity as clearly shown by the facts herein, wherein Defendant promised to have the ROLOSNIP to market in 8 months and now after 3 ½ years and two extensions, has still not gotten, as agreed, the ROLOSNIP to market.

111. The quote "unsurprised speed to market" could not be further from the truth as approximately 6-8 months is considered standard for a hand tool and Defendant has had, to date, approximately **40 months** (5-6 times what is considered standard) and **still has yet to perform the first manufacturing run**.

112. Defendant not only failed to do "what is right" and fulfill its obligations under Agreement I or Agreement II, Defendant did the opposite by intentionally choosing to do what was wrong by its dilatory actions, intentionally not performing its obligations it owes to Plaintiff, intentionally trying to bully Plaintiff, and intentionally trying to force several unilateral amendments upon Plaintiff.

82

113.   Plaintiff, prior to entering into an agreement with Defendant, reviewed www.roostergroup.com wherein some or all of these advertisements where presented, and wherein Plaintiff relied on said false advertisements as intended by Defendant to enter into Agreement I, thus Plaintiff has now been substantially injured and will likely continue to be injured as a foreseeable consequence of Defendant's false advertisements.

114.   Pursuant to 15 U.S.C. § 1118, if not already accomplished, Plaintiff requests that Defendant deliver up to this Court or its designee for destruction all copies of all portions of said websites and copies of all material having the aforesaid false or misleading advertisements thereon.

115.   Pursuant to 15 U.S.C. § 1117, Plaintiff shall be entitled to and thus respectfully request (1) Defendant's Profits for the period that Plaintiff first was injured by Defendant's false advertisements, January 2011, until Defendant removes and destroys all portions of any websites related to or associated with Defendant and all material of Defendant's containing one or more of the aforesaid false advertising

statements[19]; (2) all damages sustained by Plaintiff as a result thereof; (3) the cost of this Action; and as the present case comprises a multitude of willful, wanton, intentional, stubbornly litigious and malicious acts by Defendant in direct contradiction of and completely repugnant to Defendant's clearly false advertisements, this case is an exceptional case thus justifying (4) the award of reasonable attorneys fees.

116.    Pursuant to 15 U.S.C. § 1116, Plaintiff is entitled to a temporary and permanent injunction against Defendant to prevent further damage and as such, Plaintiff respectfully requests an injunction issue as to Defendant ordering Defendant and his attorney to file with this Court and serve upon Plaintiff all copies of material, in whatever form, electronic or paper or otherwise containing one or more of the aforesaid false advertising statements or other statements that Defendant knows or should know or that a reasonable objective person would question as being an advertisement that is potentially false or misleading, within thirty (30) days of being served with said order. Along with said copies, Plaintiff requests that said order require Defendant to publish a Court approved one page letter on each of its websites

---

[19] As of the filing of the present Complaint, 3 years and 5 months.

entitled "Correction of False or Misleading Advertisements Per Court Order Dated [Date of Order] [Civil Action File #]" on each of its websites having false or misleading advertisements from January 1, 2010 to present and, to the extent false or misleading advertisements were placed in letters, brochures, flyers, catalogs, invoices, packaging or otherwise, said letter shall be sent, via traceable US Mail, to all parties that have received said false or misleading advertisement since January 1, 2010 to present. Plaintiff further request per § 1116 that Defendant be required to file a copy with this Court and to serve a copy on Plaintiff within 30 days of Defendant being served with said Order a Report in writing under oath setting forth in detail the manner and form in which Defendant has complied with the injunction as to each false or misleading advertisement and a copy of each letter published on the respective website and each letter sent to parties receiving said mailed letter. It is further requested per § 1116 that said Order be enforceable via the contempt powers of this Court.

117. The actions of Defendant were in bad faith, constitute stubborn litigiousness, and/or have put Plaintiff to unnecessary trouble and expense, such that Plaintiff is entitled to recover from Defendant for its costs of litigation, including reasonable attorney's fees, pursuant to O.C.G.A. §13-6-11.

## COUNT XIV
## FALSE ADVERTISING UNDER THE GA FALSE ADVERTISING LAW
## (O.C.G.A § 10-1-420)

118.   Plaintiff repeats and realleges each and every allegation contained hereinabove in paragraphs 1 through 117 inclusive, as though set forth entirely herein and further states:

119.   Defendant advertises its services on its websites at www.roostergroup.com[20] and www.roostermanufacturing.com and states that Defendant is the **"leaders in ... integrity"**; that Defendant has the **"simple philosophy of doing what is right"**; that **"If you are looking for a partner with the experience to get your products to market on time and in excellent condition, please contact us"**;  and that Defendant has **"unsurprised speed to market"**.

120.   These statements are a false or misleading description of fact and/or not

---

[20] Prior to entering into Agreement I with Defendant, Plaintiff, in performing its due diligence regarding Defendant, researched the Defendant's website www.roostergroup.com and read all the material thereon, including the false advertisements, and relied thereon as part of its basis in deciding to partner with Defendant.

true and which misrepresents the nature, characteristics or quality of Defendant's services or commercial activity as clearly shown by the facts herein, wherein Defendant did not intend to provide such advertised services. Defendant promised to have the ROLOSNIP to market in 8 months and now after 3 ½ years and two contracts, has still not even manufactured the ROLOSNIP much less gotten it to market.

121. The quote "unsurprised speed to market" could not be further from the truth as approximately 8-10 months is considered standard for a hand tool and Defendant has had, to date, approximately **40 months** (4-5 times what is considered standard) and **still has yet to perform the first manufacturing run**.

122. Defendant not only failed to do "what is right" and fulfill its obligations under Agreement I or Agreement II, Defendant did the opposite by intentionally choosing to do **what was wrong.** Defendant's blatant dilatory actions and admitted intentional non-performance of its obligations it owed Plaintiff under Agreement I, Defendant's blatant dilatory actions and intentional non-performance of its obligations it owed Plaintiff under Agreement II, Defendant's intentional bullying of

87

Plaintiff, and Defendant's intentional attempts to force several unilateral amendments upon Plaintiff, is far from doing "what is right".

123.   Defendant has, during all periods relevant to the present dispute, and continues to advertise that it is a manufacturer; however, on information and belief, Defendant contracts its manufacturing out to third parties and as such is not a manufacturer, thereby violating O.C.G.A. § 10-1-424.

124.   Plaintiff, prior to entering into an agreement with Defendant, reviewed www.roostergroup.com wherein some or all of these advertisements where presented, and wherein Plaintiff relied on said false advertisements as intended by Defendant to enter into Agreement I, thus Plaintiff has now been substantially injured and will likely continue to be injured as a foreseeable consequence of Defendant's false advertisements.

125.   Pursuant to O.C.G.A. § 10-1-423 and the equity powers of this Court, if not already accomplished, Plaintiff requests that Defendant deliver up to this Court or its designee for destruction all copies of all portions of said websites and copies of all material having the aforesaid false or misleading advertisements thereon.

126. Plaintiff shall be entitled to and thus respectfully request (1) Defendant's Profits for the period that Plaintiff first was injured by Defendant's false advertisements, January 2011, until Defendant removes and destroys all portions of any websites related to or associated with Defendant and all material of Defendant's containing one or more of the aforesaid false advertising statements[21]; (2) all damages sustained by Plaintiff as a result thereof; (3) the cost of this Action; and as the present case comprises a multitude of willful, wanton, intentional, stubbornly litigious and malicious acts by Defendant in direct contradiction of and completely repugnant to Defendant's clearly false advertisements, this case is an exceptional case thus justifying (4) the award of reasonable attorneys fees.

127. Pursuant to O.C.G.A. § 10-1-423, Plaintiff is entitled to a temporary and permanent injunction against Defendant to prevent further damage and as such, Plaintiff respectfully requests an injunction issue as to Defendant ordering Defendant and his attorney to file with this Court and serve upon Plaintiff all copies of material, in whatever form, electronic or paper or otherwise containing one or more of the

---

[21] As of the filing of the present Complaint, 3 years and 5 months.

89

aforesaid false advertising statements or other statements that Defendant knows or

should know or that a reasonable objective person would question as being an

advertisement that is potentially false or misleading, within thirty (30) days of being

served with said order. Along with said copies, Plaintiff requests that said order

require Defendant to publish a Court approved one page letter on each of its websites

entitled "Correction of False or Misleading Advertisements Per Court Order Dated

[Date of Order] [Civil Action File #]" on each of its websites having false or

misleading advertisements from January 1, 2011 to present and, to the extent false or

misleading advertisements were placed in letters, brochures, flyers, catalogs,

invoices, packaging or otherwise, said letter shall be sent, via traceable US Mail, to

all parties that have received said false or misleading advertisement since January 1,

2011 to present. Plaintiff further request that Defendant be required to file a copy

with this Court and to serve a copy on Plaintiff within 30 days of Defendant being

served with said Order a Report in writing under oath setting forth in detail the

manner and form in which Defendant has complied with the injunction as to each

false or misleading advertisement and a copy of each letter published on the

respective website and each letter sent to parties receiving said mailed letter. It is

further requested that said Order be enforceable via the contempt powers of this

Court.

128.   The actions of Defendant were in bad faith, constitute stubborn litigiousness, and/or have put Plaintiff to unnecessary trouble and expense, such that Plaintiff is entitled to recover from Defendant for his costs of litigation, including reasonable attorney's fees, pursuant to O.C.G.A. §13-6-11.

## COUNT XV
## INDEMNIFICATION UNDER AGREEMENT I AND/OR AGREEMENT II

129.   Plaintiff repeats and realleges each and every allegation contained hereinabove in paragraphs 1 through 128, inclusive, as though set forth entirely herein and further states:

130.   According to Agreement II, ¶ 3.A., Defendant agreed to indemnify and hold harmless Plaintiff against any and all claims.  According to Agreement I, ¶ 3.A., Defendant agreed to "indemnify, hold harmless and defend Plaintiff, its officers, employees, and agents ("Licensor Protected Class"), against any and all claims, suits, losses, damage, costs, fees, and expenses, including attorneys' fees, asserted by a third party against any member of the Licensor Protected Class."

131.  Consequently, Defendant should be required to indemnify Plaintiff against all claims, costs, expenses, damages, losses and attorneys' fees relating to Agreement I and/or Agreement II.

132.  The actions of Defendant were in bad faith, constitute stubborn litigiousness, and/or have put Plaintiff to unnecessary trouble and expense, such that Plaintiff is entitled to recover from Defendant for its costs of litigation, including reasonable attorney's fees, pursuant to O.C.G.A. §13-6-11.

## COUNT XVI
## THEFT BY CONVERSION
## (O.C.G.A § 16-8-4)

133.  Plaintiff repeats and realleges each and every allegation contained hereinabove in paragraphs 1 through 132, inclusive, as though set forth entirely herein and further states:

134.  Defendant, per Agreement I and Agreement II, has been since November 10, 2011 in legal possession of Plaintiff's exclusive intellectual property rights and

could potentially continue for a 10-year period.

135.   Pursuant to said agreements and as fully known by Defendant,

Defendant had a duty to take certain actions with Plaintiff's property wherein if said

actions were taken, Plaintiff's property would not only have been preserved, but

would have increased in value, and if certain actions were not taken, Plaintiff's

property value would decrease if not be destroyed.  As Defendant was very familiar

with these types of properties and Plaintiff's capabilities, Defendant knew that his

failure to take said actions would result in a substantial, if not complete, reduction of

value in Plaintiff's property[22].

136.   Defendant failed to fulfill any of its duties under Agreement I and most

_____

[22] Three reasons for this devaluation: 1) patent related rights have a limited life of 20 years from filing; 2) competitive products become increasingly more available over time; 3) a new unique and novel tool with no competition (as when it is first released before competitive products have had a chance to surface) has a much greater value than one that is released after several competitive products are on the market; 4) as was also known by Defendant, if Defendant had simply not agreed to take possession of Plaintiff's property, Plaintiff at that time, could have taken the needed actions itself or, as the value of said property would have still been high, Plaintiff could have sold said property at said higher value; on the flip side, if Defendant had fulfilled its obligations under said agreements, the value of Plaintiff's property would have been preserved and would have increased in value; by intentionally withholding Plaintiff's property and failing to take the necessary actions to preserve and protect said property as was negotiated and agreed to by Defendant, Defendant was fully aware that any substantial delay would result in Plaintiff not being able to financially proceed with said property and that for the above reasons, would have been substantially devalued.

of its duties under Agreement II thus, substantially, if not completely, destroying the value of Plaintiff's property[23] to a point of legally converting Plaintiff's property to its own.

137.   As a direct and proximal cause of Defendant's conversion, Plaintiff has suffered substantial damages and pursuant to O.C.G.A. § 16-8-4, Plaintiff is entitled to and respectfully seeks the following:

A)   The market value of Plaintiff's property on the date when the conversion occurred;

B)   All licensing charges from the date Agreement I was executed until the date of the trial;

C)   Interest on the unpaid balance each month at the current legal rate from the date this Court orders Defendant to pay replacement costs until the date the judgment is satisfied in full; and

_____

[23] An analogous example might be a fine piece of art like a sculpture that requires climate control and periodic cleanings to preserve its integrity and thus value. In addition, by preserving its integrity the sculpture, the sculpture would increase in value. Party D leases from Party A said sculpture with an agreement that Party D would maintain the property in a climate controlled environment and would perform periodic cleaning; however, Party D, fails to perform said duties and as a result, the sculpture substantially deteriorates thus not only does the sculpture not increase in value, it substantially decreases in value.

D)     All expenses incurred by Plaintiff in pursuing Defendant regarding Plaintiff's property and any other bona fide expenses.

138.   The actions of Defendant were in bad faith, constitute stubborn litigiousness, and/or have put Plaintiff to unnecessary trouble and expense, such that Plaintiff is entitled to recover from Defendant for his costs of litigation, including reasonable attorney's fees, pursuant to O.C.G.A. §13-6-11.

**COUNT XVII**
**THEFT BY EXTORTION**
**(O.C.G.A. § 16-8-16)**

139.   Plaintiff repeats and realleges each and every allegation contained hereinabove in paragraphs 1 through 138, inclusive, as though set forth entirely herein and further states:

140.   Defendant has and continues to commit Theft by Extortion by unlawfully retaining money rightly owned by Plaintiff pursuant to Agreement I with threats and acts to:

A) Disseminate information tending to subject Plaintiff to hatred, contempt, or

ridicule or to impair his credit or business repute; and/or

B) Testify or provide information or withhold testimony or information with respect to another's legal claim or defense.

141. As a direct and proximal cause of Defendant's theft by extortion, Plaintiff has suffered substantial damages and is entitled to and respectfully seeks the following:

A)      The market value of Plaintiff's property on the date when the conversion occurred;

B)      All licensing charges from the date Agreement I was executed until the date of the trial;

C)      Interest on the unpaid balance each month at the current legal rate from the date this Court orders Defendant to pay replacement costs until the date the judgment is satisfied in full;

D)      All expenses incurred by Plaintiff in pursuing Defendant regarding Plaintiff's property and any other bona fide expenses; and

E)      Any other reward this Court deems appropriate.

142. The actions of Defendant were in bad faith, constitute stubborn

litigiousness, and/or have put Plaintiff to unnecessary trouble and expense, such that Plaintiff is entitled to recover from Defendant for his costs of litigation, including reasonable attorney's fees, pursuant to O.C.G.A. §13-6-11.

## COUNT XVIII
## THEFT BY TAKING
## (O.C.G.A. § 16-8-2)

143.   Plaintiff repeats and realleges each and every allegation contained hereinabove in paragraphs 1 through 142, inclusive, as though set forth entirely herein and further states:

144.   Pursuant to O.C.G.A. § 16-8-2, a person commits the offense of theft by taking when he, being in lawful possession thereof, unlawfully appropriates any property of another with the intention of depriving him of the property, regardless of the manner in which the property is taken or appropriated.

145.   Defendant, per Agreement I, was in lawful possession of Plaintiff's exclusive intellectual property rights and Plaintiff's MMR monies.

146. Defendant in violation of Agreement I, appropriates Plaintiff's said property by intentionally failing to perform its duties under said Agreement with the intent that Plaintiff be deprived of same.

147. Per O.C.G.A. §16-8-5.1., the following circumstances permit inference of intent to avoid payment and thus intent to convert or take ones property if a person knowingly:

A) Abandoned any property at a location that is not the location agreed upon for return and that would not be reasonably known to the owner;

B) Returned any property to a location that would not reasonably be known to the owner without notifying the owner; or

C) Returned any property at a time beyond posted business hours of the owner.

148. Defendant failed to pay the rental fees owed to Plaintiff per Agreement I and admittedly abandoned Plaintiff's property thus ignoring its duties under Agreement I. Moreover, Defendant chose not to advise Plaintiff for several months after Defendant had abandoned Plaintiff's property and thus Plaintiff obviously was unaware of its location.

149. As a direct and proximal cause of Defendant's theft by taking, Plaintiff has suffered substantial damages and is entitled to and respectfully seeks the following:

A) The market value of Plaintiff's property on the date when the conversion occurred;

B) All licensing charges from the date Agreement I was executed until the date of the trial;

C) Interest on the unpaid balance each month at the current legal rate from the date this Court orders Defendant to pay replacement costs until the date the judgment is satisfied in full;

D) All expenses incurred by Plaintiff in pursuing Defendant regarding Plaintiff's property and any other bona fide expenses; and

E) Any other award this Court deems appropriate.

150. The actions of Defendant were in bad faith, constitute stubborn litigiousness, and/or have put Plaintiff to unnecessary trouble and expense, such that Plaintiff is entitled to recover from Defendant for his costs of litigation, including reasonable attorney's fees, pursuant to O.C.GA. §13-6-11.

99

## COUNT XIX
## PERMANENT INJUNCTIVE RELIEF

151.   Plaintiff repeats and realleges each and every allegation contained hereinabove in paragraphs 1 through 150, inclusive, as though set forth entirely herein and further states:

152.   Via any of the statutory rights presented herein that allow for an injunction and/or the equity powers of this Court, Plaintiff respectfully request, in addition to all other remedies available, a permanent injunction that:

A)  Defendant, for itself or for others, be permanently enjoined from designing, assisting in the design, selling, offering for sale, marketing, distributing, manufacturing or having manufactured, consulting about or providing any assistance regarding a tool similar to the ROLOSNIP technology; and

B) Defendant be enjoined from any other act as this Court deems appropriate.

## COUNT XX
## ACCOUNTING

153.   Plaintiff repeats and realleges each and every allegation contained hereinabove in paragraphs 1 through 152 inclusive, as though set forth entirely

100

herein and further states:

154. Plaintiff hereby sets forth as a Count to the present Complaint,

Accounting, such that Plaintiff is entitled to an accounting of Defendant's business

from and including the years 2011, 2012, 2013, 2014 and any other periods thereafter

up until an award by this Court.

## COUNT XXI
## INTENTIONAL, WILLFUL, AND WANTON VIOLATIONS OF CLAIMS - PUNITIVE DAMAGES

155. Plaintiff repeats and realleges each and every allegation contained

hereinabove in paragraphs 1 through 154, inclusive, as though set forth entirely

herein and further states:

156. Defendant's violations of common law claims were committed

willfully, intentionally, knowingly and in bad faith, with intent to deceive

Plaintiff and/or the public. As such, Plaintiff should be entitled to recover its

damages, Defendant's profits, treble damages in amount up to three times

any damages award, the costs of the action, including its attorney's fees, and

101

punitive damages as provided for in Ga. Code Ann. § 51-12-5.1.

## COUNT XXII
## NEGLIGENCE BY PERSON GIVEN TRUST OR CONFIDENCE
## (O.C.G.A. § 51-1-19)

157.   Plaintiff repeats and realleges each and every allegation contained hereinabove in paragraphs 1 through 156, inclusive, as though set forth entirely herein and further states:

158.   O.C.G.A. § 51-1-19 states that "when trust or confidence is reposed in a person in consideration of the payment or promise of a reward to him, negligence in the person trusted which results in injury to the other person shall give the injured party a right of action.

159.   Defendant is under a confidential provision and was trusted with Plaintiff's intellectual property rights per the parties' Agreement I wherein Defendant received exclusive rights that, if Defendant had performed, would have resulted in payments to Defendant.

102

160. Defendant per Agreement I and/or II owed, among other acts, a duty of care and a duty to act in good faith to Plaintiff.

161. Defendant, in the alternative to other claims herein, breached its duty of care and good faith by negligently abandoning the ROLOSNIP, failing to manufacture, market or sell.

162. As a direct and proximal cause of Defendant's negligence, Plaintiff has suffered substantial damages and is entitled to and respectfully seeks the following:

A)     The market value of Plaintiff's property on the date when the conversion occurred;

B)      All licensing charges from the date Agreement I was executed until the date of the trial;

C)     Interest on the unpaid balance each month at the current legal rate from the date this Court orders Defendant to pay replacement costs until the date the judgment is satisfied in full;

D)     All expenses incurred by Plaintiff in pursuing Defendant regarding Plaintiff's property and any other bona fide expenses; and

E)     Any other award this Court deems appropriate.

103

163. The actions of Defendant were in bad faith, constitute stubborn litigiousness, and/or have put Plaintiff to unnecessary trouble and expense, such that Plaintiff is entitled to recover from Defendant for his costs of litigation, including reasonable attorney's fees, pursuant to O.C.G.A. §13-6-11.

## COUNT XXIII
## LITIGATION EXPENSES - ATTORNEYS' FEES

164. Plaintiff repeats and realleges each and every allegation contained hereinabove in paragraphs 1 through 163, inclusive, as though set forth entirely herein and further states:

165. Defendant's actions were committed willfully, intentionally, knowingly, recklessly and in bad faith, with intent to deceive.

166. Defendant's malicious and bad faith acts constitute stubborn litigiousness and have put Plaintiff to unnecessary trouble and expenses such that

104

Plaintiff is entitled to recover from Defendant for his expenses of litigation, including reasonable attorney's fees, pursuant to O.C.G.A. § 13-6-11 or O.C.G.A. § 9-15-4.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully prays for and demands as follows:

## AS TO ALL COUNTS

A.     That Defendant be held liable, at law and at equity, as may be appropriate, under each claim for relief set forth in this Complaint;

B.     That Plaintiff be granted preliminary, and thereafter permanent, injunction(s) prohibiting Defendant from continuing their unlawful acts complained of herein, and from selling, trading or otherwise alienating any property;

C.     That Plaintiff recover prejudgment and post judgment interest from Defendant, on any damages awarded to Plaintiff;

D.     That Plaintiff recover attorney's fees, pursuant to §O.C.G.A. 13-6-11 and/or under any statute referenced hereunder and/or the equitable and inherent powers of this Court to prevent injustice;

E.     That Plaintiff recover all other costs, liabilities and disbursements that may be

105

incurred by Plaintiff in this action;

F.      That Defendants be required to pay to Plaintiff all punitive and exemplary damages in an amount to be determined at trial for Defendants' deliberate, intentional, malicious, fraudulent and willful unlawful acts, as pled hereinabove;

G.      That Defendant be required to have an independent third party do an accounting of the years 2011, 2012, 2013, 2014 and any time frame thereafter up until Judgment;

H.      That the Court grant to Plaintiff such other and further relief as it may deem just, proper and equitable;

## AS TO COUNTS I, II OR III (ALTERNATIVELY)

I.      That Defendant be required to pay to Plaintiff an amount to be determined at trial for damages suffered by Plaintiff including, but not limited to, failure to enjoy the benefits of the bargain, loss profits, consequential damages, lost opportunity, costs and expenses incurred relating to the parties agreements, litigation costs and attorney's fees, punitive damages (to punish and deter Defendant from repeating its intentional torts) and any other damages this Court or a Jury deem appropriate for Defendant's willful, wonton and malicious fraudulent acts.

106

## AS TO COUNTS IV OR V (ALTERNATIVELY)

J.      That, pursuant to O.C.G.A. § 16-14-6(a)(1), this Court issue an Order requiring

Defendant to divest itself of monies in its possession that is rightfully Plaintiff's;

K.      That, pursuant to O.C.G.A. § 16-14-6(a)(2), this Court issue an Order

permanently restricting Defendant from, directly or indirectly, investing in, owning,

operating or assisting others in owning or operating any business in the United States

that is related to Plaintiff's ROLOSNIP technology or any sniping or shearing tools;

L.      That, pursuant to O.C.G.A. § 16-14-6(a)(5), this Court issue an Order to the

Georgia Secretary of State  permanently revoking Defendant's Foreign Certificate of

Authorization to do work within the State of Georgia and an Order to Defendant to

permanently enjoin Defendant from doing business any where in the State of

Georgia, wherein violation of same immediately subjects the CEO and the President

of Defendant to criminal contempt to the fullest extent permitted by law;

M.      That, pursuant to O.C.G.A. § 16-14-6(c), this Court award Plaintiff its actual

damages, three (3) times its actual damages incurred, its reasonable attorney's fees

and all litigation expenses incurred;

107

N.    That this Court acknowledge Plaintiff's reservation and right to any forfeited

property or proceeds superior to any other party's claim or right thereto;

## AS TO COUNTS VI

O.    That, pursuant to O.C.G.A. § 10-1-373(a), a permanent injunction issue against

Defendant to prevent further unfair or deceptive trade practices and thus further

damage;

P.    That, pursuant to O.C.G.A. § 10-1-373(b), Defended be required to pay

Plaintiff for all of Plaintiff's costs of the present litigation;

Q.    That, pursuant to O.C.G.A. § 10-1-373(b)(2), Defendant be required to pay

Plaintiff for all of Plaintiff's attorney fees and other costs of the present dispute;

## AS TO COUNTS VII, VIII OR XI (ALTERNATIVELY)

R.    That Plaintiff be awarded its actual damages including but not limited to the

following.  Please note that the below numbers are considered by Plaintiff as the

minimum amount of damages and when appropriate will be adjusted:

Benefit of the Bargain

$1,036,750  Guaranteed MMR for the term of the contract (250,000 units/yr
            @ $0.50/unit per Agreement I)

108

$2,200,000   Original quoted minimum by Defendant for term
(800,000 units/yr)

$25,600,000 Conservative sales by Plaintiff via TV & Internet (800,000
units/yr @ $4 gross profit/unit)

| $28,836,750 Minimum Expected Gross Profit for Term of Agreement I |
| --- |

Necessary Contract Expenses Incurred

| $47,600 | Attorney's Fees to negotiate, review, revise and finalize Agreement I ($425/hr @ 112hrs) |
| --- | --- |
| $18,275 | Attorney's Fees to negotiate, review, revise and finalize Agreement II and dispute research and resolution ($425/hr @ 43hrs) |
| $26,950 | Attorney's Fees for various legal notices and meetings with client, various legal research, communications and advise ($425/hr @ 98hrs) |
| $41,650 | Attorney's Fees related to protecting IP ($425/hr @ 86hrs) |
| $2,350 | Government Filing Fees |
| $5,500 | Prototyping and Engineering |
| $6,470 | Travel Expenses |
| **$148,795** | **Necessary Contract Expenses** |

Litigation Costs and Attorney's Fees (as of the June 6, 2014)

| $100,725 | Various meetings with client, research regarding various causes of action and damages, communications, preparation of extensive Complaint, summons and filing documents ($425/hr @ 237 hours) |
| --- | --- |

------------------------

| $29,009,470 Total Damages (not including punitive damages and interest) |
| --- |

| (See Counts IX and X below)  Punitive Damages (3x) |
| --- |

109

$29,086,270  Total Damages (not including punitive damages and interest)

## AS TO COUNTS IX OR X

S.      That Defendant be required to pay to Plaintiff its actual damages plus 3x its

actual damages as punitive, but in no even less than Twenty Nine Million Nine

Thousand Four Hundred Seventy and no/100 U.S. Dollars ($29,009,470) plus

treble/punitive damages of Eighty Seven Million Twenty Eight Thousand Four

Hundred Ten and no/100 U.S. Dollars ($87,028,410) for a total of not less than One

Hundred Sixteen Million Thirty Seven Thousand Eight Hundred Eighty and no/100

U.S. Dollars ($116,037,880) and other damages this Court deems appropriate for

Defendant's multiple willful and malicious breaches;

T.      That, pursuant to O.C.G.A. §13-6-13 or as amended, Defendant be required to

pay Plaintiff interest at the legal rate of seven percent (7%) per annum, or as

amended, from the date of breach until payment;

## AS TO COUNTS XII

U.      That Defendant be required to pay to Plaintiff its actual damages plus 3x its

actual damages as punitive, but in no even less than Twenty Nine Million Nine

Thousand Four Hundred Seventy and no/100 U.S. Dollars ($29,009,470) plus

treble/punitive damages of Eighty Seven Million Twenty Eight Thousand Four

Hundred Ten and no/100 U.S. Dollars ($87,028,410) for a total of not less than One

Hundred Sixteen Million Thirty Seven Thousand Eight Hundred Eighty and no/100

U.S. Dollars ($116,037,880) and other damages this Court deems appropriate for

Defendant's multiple willful and malicious breaches;

V.      That, pursuant to O.C.G.A. §13-6-13 or as amended, Defendant be required to

pay Plaintiff interest at the legal rate of seven percent (7%) per annum, or as

amended, from the date of breach until payment;


## AS TO COUNTS XIII OR XIV (ALTERNATIVELY)

W.      That, pursuant to 15 U.S.C. § 1118 and O.C.G.A. § 10-1-423 and the equity

powers of this Court, Defendant be required to deliver up to this Court or its

designee for destruction all copies of all portions of said websites and copies of all

material having the aforesaid false or misleading advertisements thereon;

X.      That, pursuant to 15 U.S.C. § 1117, Defendant be required to account for and

to pay Plaintiff (1) Defendant's Profits for the period that Plaintiff first was injured

by Defendant's false advertisements, January 2011, until Defendant removes and

destroys all portions of any websites related to or associated with Defendant and all

111

material of Defendant's containing one or more of the aforesaid false advertising statements[24]; (2) all damages sustained by Plaintiff as a result thereof; (3) the cost of this Action; and as the present case comprises a multitude of willful, wanton, intentional, stubbornly litigious and malicious acts by Defendant in direct contradiction of and completely repugnant to Defendant's clearly false advertisements,  this case is an exceptional case thus justifying (4) the award of reasonable attorneys fees;

Y.      That, pursuant to 15 U.S.C. § 1116, a temporary and permanent injunction against Defendant issue ordering Defendant and his attorney to file with this Court and serve upon Plaintiff all copies of material, in whatever form, electronic or paper or otherwise containing one or more of the aforesaid false advertising statements or other statements that Defendant knows or should know or that a reasonable objective person would question as being an advertisement that is potentially false or misleading, within thirty (30) days of being served with said order.  Along with said copies, Plaintiff requests that said order require Defendant to publish a Court approved one page letter on each of its websites entitled "Correction of False or Misleading Advertisements Per Court Order Dated [Date of Order] [Civil Action File

---

[24] As of the filing of the present Complaint, 3 years and 5 months.

#]" on each of its websites having false or misleading advertisements from January 1,

2010 to present and, to the extent false or misleading advertisements were placed in

letters, brochures, flyers, catalogs, invoices, packaging or otherwise, said letter shall

be sent, via traceable US Mail, to all parties that have received said false or

misleading advertisement since January 1, 2010 to present. Plaintiff further request

per § 1116 that Defendant be required to file a copy with this Court and to serve a

copy on Plaintiff within 30 days of Defendant being served with said Order a Report

in writing under oath setting forth in detail the manner and form in which Defendant

has complied with the injunction as to each false or misleading advertisement and a

copy of each letter published on the respective website and each letter sent to parties

receiving said mailed letter. It is further requested per § 1116 that said Order be

enforceable via the contempt powers of this Court;


## AS TO COUNTS XV

Z.     That Defendant be required to pay to Plaintiff its actual damages, but in no

even less than Twenty Nine Million Nine Thousand Four Hundred Seventy and

no/100 U.S. Dollars ($29,009,470) plus interest.


113

## AS TO COUNTS XVI, XVII OR XVIII (ALTERNATIVELY)

AA.   That Defendant be required to pay to Plaintiff the market value of Plaintiff's property on the date when the conversion occurred;

BB.   All licensing charges from the date Agreement I was executed until the date of the trial;

CC.   Interest on the unpaid balance each month at the current legal rate from the date this Court orders Defendant to pay replacement costs until the date the judgment is satisfied in full;

DD.   All expenses incurred by Plaintiff in pursuing Defendant regarding Plaintiff's property and any other bona fide expenses;

## AS TO COUNTS XXII

EE.   That Defendant be required to pay to Plaintiff the market value of Plaintiff's property on the date when the conversion occurred;

FF.   All licensing charges from the date Agreement I was executed until the date of the trial;

GG.   Interest on the unpaid balance each month at the current legal rate from the date this Court orders Defendant to pay replacement costs until the date the judgment

114

is satisfied in full;

HH.    All expenses incurred by Plaintiff in pursuing Defendant regarding Plaintiff's

property and any other bona fide expenses; and

II.    Any other award this Court deems appropriate.


Respectfully submitted this 12th day of June, 2014.


_____

Joel D. Myers, Esq.
Georgia Bar No. 533,147
MYERS & ASSOCIATES, PC
400 Galleria Parkway
Suite 240
Atlanta, Georgia 30339
Phone: (470) 328-3128  Fax: (678) 218-5926
myersiplaw@yahoo.com
Counsel for Plaintiff